[No. 29528. *En Banc.* June 7, 1947.]

THE STATE OF WASHINGTON, *Appellant,* v. NORTHWEST
MAGNESITE COMPANY *et al., Respondents.*[1]

[1]Reported in 182 P. (2d) 643.

*The Attorney General, John Spiller, Assistant,* and *E. P. Donnelly, Special Assistant,* for appellant.

*John T. Raftis* and *Robertson & Smith,* for respondents.

STEINERT, J.—Plaintiff, the state of Washington, commenced this action originally against Northwest Magnesite Company, a Washington corporation, defendant, to recover from it additional royalties, and interest thereon, alleged to be due the plaintiff from the sale of minerals mined from public land leased to the defendant. In an amended complaint, the state joined as additional defendants Harbison-Walker Refractories Company and General Refractories Company, foreign corporations, alleging that those concerns in years past had acquired ownership of Northwest Magnesite Company pursuant to a combination and con-

spiracy to corner the magnesite market in the United States and elsewhere; that since then Harbison-Walker Refractories Company and General Refractories Company had conducted all sales of Northwest Magnesite Company's output; and that those two foreign corporations had fixed the amount of receipts of the domestic company for its magnesite production.

By its action, the state sought to have the court determine that it was entitled to royalties computed on the basis of the amounts received by the dominant corporations from their customers for the products of their subsidiary, Northwest Magnesite Company, and also to determine that Northwest Magnesite Company had taken certain improper allowances in calculating royalties due the state. The state's calculation of the amount due it was $133,817.25 as of April 30, 1943.

For convenience, we shall hereinafter refer to the respective defendants as Northwest, Harbison-Walker, and General.

The defendant Northwest answered, admitting that it had deducted from gross receipts all costs of mining and treatment, and other expenses, before calculating royalties, so that its remittances to the state were, in effect, royalties on its own net profits from sales of magnesite quarried from the state's property; but denying that it was then indebted to the state in any amount. It also asserted four affirmative defenses: (1) accord and satisfaction; (2) conduct of the parties constituting a binding practical construction of the terms of the mining contract existing between Northwest and the state; (3) estoppel; and (4) laches.

Northwest also moved that the court quash and set aside the service of summons and amended complaint which had been made upon the other defendants, Harbison-Walker and General, by delivery of process and the accompanying pleading to an officer of Northwest only. Subsequently, Harbison-Walker and General entered their special appearances for the purpose of a similar motion, and, when a ruling on that question was reserved by the court, adopted the answer of Northwest, at the same time preserving their special appearances.

At the conclusion of an extensive trial, without a jury, in July, 1943, and after an inspection of the premises, the trial judge rendered a memorandum opinion and decision on March 1, 1944, in which he declared, as findings, that the mining contract between the state and Northwest was inappropriate to the operation in question; that the venture was not a strictly mining operation, but rather a manufacturing enterprise; that the statute under which the contract was made, as well as the contract itself, was ambiguous with respect to the formula for royalties, "four per cent of moneys received from the sale of minerals from said lands, after deducting therefrom the cost of transportation and treatment"; that the statute and contract were therefore open to construction by the parties and by the court; and that the manager of Northwest and the commissioner of public lands had orally agreed to a deduction, from gross receipts, of all costs of production, including removal of overburden from the ore site, quarrying, and ore reduction, before calculation of royalties. From these findings, the trial judge concluded, in his memorandum opinion and decision, that Northwest's defense of practical construction was good, and that the state was estopped to deny that construction.

The trial judge further found that, during the period of the negotiations here involved, the land commissioner had full knowledge of the corporate relations between Northwest and its parent corporations, and of the differential between the price received by Northwest for magnesite and the market price received therefor by Harbison-Walker and General. From these latter findings, the trial judge concluded that these transactions between the dominant corporations and their subsidiary were lawful, and that, since the three corporations were wholly distinct entities, and since Northwest had valuable assets in this state, there was no practical reason why Harbison-Walker and General should be joined in the action.

The trial court therefore held (1) that the motions to quash and set aside the service of summons and amended complaint upon defendants Harbison-Walker and General

should be granted, "for the reason that the evidence discloses that no cause of action exists as to them," and (2) that Northwest was entitled, under its contract with the state, to deduct all costs of exploration, development, extraction, transportation, and processing of ore, and overhead expense generally, but was not entitled to deduct items of depletion, Federal income and capital stock taxes, state corporation tax, and certain insurance expense. The court thereupon ordered an accounting in accordance with the above terms.

Upon a second hearing, in September, 1944, further evidence was taken relative to the accounting. At that hearing, the trial judge denied motions for reconsideration of the memorandum decision, for entry of judgment in favor of the plaintiff as prayed for in the amended complaint, and for a new trial; directed entry of an order quashing service of summons upon Harbison-Walker and General, for the reason that those defendants were not proper parties to the proceeding and had not been properly served with process; and entered judgment against Northwest in the sum of $10,940.88, that being the amount due under the findings of the memorandum decision, after certain adjustments, as of December 31, 1943. The court also decreed in its judgment that, from and after that date, Northwest should compute and make payments of royalty in accordance with the terms and conditions set forth in the memorandum decision, "until otherwise provided by law." The court allowed no interest prior to the date of judgment and denied all parties any recovery of costs. Conceiving the amount of the judgment to be insufficient, the state appealed.

Before considering the assignments of error presented by the state upon the appeal, we deem it beneficial to set forth in some detail certain facts relevant to this litigation. For a clearer understanding of the facts, it becomes necessary to explain the nature of magnesite and its production in the United States; the corporate and business relations of Northwest to Harbison-Walker and General; and the development of what is herein referred to as the Moss claim, which comprises the land leased by the state to Northwest,

and the subsequent dispute as to royalties arising therefrom.

Magnesite is a mineral consisting of magnesium carbonate. It is a product of alteration of magnesium silicates and occurs, so far as is pertinent to our inquiry, as a replacement product, in dolomite rock, in varying degrees of purity. Its principal use is in the manufacture of highly refractory firebricks for lining steel and electric furnaces, although magnesite is but one of numerous types of such bricks, each having a special value.

Crude magnesite ore contains much moisture, and freight rates on such ore are prohibitive. It is thus an economic necessity that the ore be calcined at or near the place where it is mined or quarried from the earth. Calcining is a process by which the water and carbonic acid are driven off. If the ore is then "clinkered," it becomes deadburned magnesite, a product usable by industry.

Prior to the First World War, no magnesite was mined in this country. Manufacturers of refractory brick got some magnesite derived as a by-product of the manufacture of carbonic acid, but for the most part they imported it from Europe, particularly Austria. With the advent of that war and the necessity for increased steel production, deposits of magnesite ore in the United States, particularly in California and in Stevens county, Washington, were developed, and Northwest's plant at Chewelah became the first highly developed magnesite property in this country.

After the war, Pacific coast producers could not compete with cheap imports, which drove the market price of magnesite downward from $37.50 per ton in 1918 to $23 per ton in 1921. The principal economic burden to these producers was freight costs, ranging from $12.50 to $16.50 per ton between Chewelah, Washington, and Chester, Pennsylvania, as contrasted with a range of from $4.50 to $5 per ton between the European port of Trieste and Chester, Pennsylvania.

In 1922, a tariff of about $11.50 per ton was imposed on magnesite imports, a differential apparently sufficient to enable Northwest to operate profitably, since it made sales of magnesite as early as March, 1923, and has continued

production to the time of the judgment and decree here in question.

We shall now explain briefly the corporate history of Northwest. That company was one of several firms which became active in seeking to produce magnesite in Stevens county, Washington, during the First World War. It was incorporated in 1917, at Spokane, with an authorized capital of one million dollars, divided into ten thousand shares of common stock. The most exact purpose stated in its articles of incorporation was:

"2. To engage in refining, calcining and reducing minerals taken and removed from its deposits of magnesite, dolomite and lime, and in connection therewith to construct, own, maintain and operate such plants and mills as may be requisite and necessary to carry on such operation of refining, calcining and reducing said minerals, or any of the kindred products of any such minerals."

The four trustees designated in the original articles were B. L. Thane and R. D. Adams, of San Francisco, and R. S. Talbot and Seabury Merritt, of Spokane.

As organized, the company was prepared only to sell crude ore. To produce the finished article, deadburned magnesite, required a substantial investment in new plant, and for this purpose Talbot and Thane solicited William Crocker and Roy Bishop, of San Francisco, for financial assistance; and these two last-named individuals subsequently became owners of a substantial amount of Northwest's capital stock.

In 1918, Crocker and Bishop went to Pittsburgh and represented to Harbison-Walker, which manufactured refractory brick of various types and maintained a large sales organization, that Northwest was in a position to produce deadburned magnesite, but not to market it, and that Northwest desired to sell its production to Harbison-Walker. In April of that year, a marketing contract was signed, whereby Harbison-Walker agreed to buy all of its requirements of deadburned magnesite from Northwest, and Northwest agreed to sell substantially all of its production to Harbison-Walker, and not to sell such product to any other person

for refractory purposes except with the consent of Harbison-Walker. A price scale was arrived at whereby Northwest would receive for its magnesite, f.o.b. Chewelah, Washington, approximately one half of the average selling price per ton, f.o.b. Chester, Pennsylvania, received by Harbison-Walker from its customers. Hence, if Harbison-Walker sold deadburned magnesite to steel manufacturers during a month for an average price of $37 per ton, f.o.b. Chester, then Northwest was to receive $18.50 per ton, f.o.b. Chewelah, for its shipments to Harbison-Walker during the same period. Either party was free to withdraw from the marketing contract on sixty days' notice. Testimony is to the effect that this agreement was mutually beneficial.

However, the end of the war and the resumption of trade with Austria ended the artificial scarcity of magnesite, and in consequence thereof Northwest ceased operations. Apparently, the marketing agreement then lapsed.

At about this time, many of the investors in Northwest's stock desired to dispose of their holdings, and, according to some testimony in the case, Mr. Bishop requested Harbison-Walker to buy this stock as an accommodation to those stockholders. In any event, Harbison-Walker purchased an initial forty-one hundred shares in April, 1921, and by additional purchases early in 1923 acquired a majority interest in Northwest. At this time, Northwest commenced operations again. Thereafter, the remaining shareholders sold their stock to Harbison-Walker, so that by November, 1925, it was in full ownership. The incumbent directors and manager were, however, retained.

In 1927, General, which was a competitor of Harbison-Walker and had been purchasing magnesite from Northwest, acquired four thousand shares of Northwest's stock from Harbison-Walker. It was stated at the trial that a purpose of this was to share the risk of investment, because of the dependence of Northwest upon a protective tariff rate.

Since that year, the formal relationship between the three corporations has remained static. It appears that both Harbison-Walker and General customarily contract to sell

deadburned magnesite, f.o.b. Chewelah, to steel manufacturing concerns, and then send the shipping orders to Northwest. In addition, the two eastern corporations order shipments for their own use in manufacturing refractory brick. Northwest, in turn, loads and ships the magnesite it has quarried and processed, and sends invoices therefor direct to Harbison-Walker and General, charging them a set price per ton, which price has been seventeen dollars per ton of standard deadburned grain magnesite, f.o.b. Chewelah, since 1928. It also appears that Northwest maintains only a work office at Chewelah, its bookkeeping and financing being carried on from an office adjacent to that of Harbison-Walker, in Pittsburgh. Harbison-Walker charges Northwest a monthly management fee, although the nature of the services rendered is not apparent from the record.

In 1942, Northwest's articles of incorporation were amended. The amended articles avowed the purpose of developing mineral resources within the state of Washington, "or elsewhere." In all probability, this was to reflect Northwest's activity at Cape May, New Jersey, where it processes dolomite rock with sea water to obtain magnesite. The number of trustees was increased to seven, including E. A. Garber, Chewelah; Raymond Willey, J. E. MacCloskey, Jr., and P. R. Hilleman, of Pittsburgh, Pennsylvania; and Floyd L. Greene, M. G. Myrelius and R. P. Heuer, of Philadelphia, Pennsylvania. From the evidence, it appears that Garber was also vice-president and general manager of Northwest, but that, although he had been employed by Harbison-Walker prior to 1933, he had no formal connection subsequent to that year with either that firm or General; Willey was president of Northwest and also president of Harbison-Walker; MacCloskey was chairman of the board, and Hilleman was secretary, of Harbison-Walker; Greene was president, and Myrelius was secretary-treasurer, of General. Heuer's connection also appears to have been with General.

We now turn our attention to the interest which the state of Washington had in this activity during the periods referred to above. In 1916, one Raymond Allen applied to the

state commissioner of public lands for a lease of a certain forty-acre tract of school grant land in Stevens county, stating in his application that he had found thereon "highly magnesiam limestone suitable for refractory and other purposes." A month later, he amended this description to read "magnesite."

In 1917, the commissioner entered into a contract with Allen, whereby the forty-acre tract known and herein referred to as the Moss claim, was leased to Allen for thirty years, for the purpose of "exploring for and mining and taking out and removing therefrom the ore therein contained, containing copper, silver, lead, gold, and other valuable minerals (except coal)." The lessee obligated himself to pay, monthly, four per cent of "all moneys received from the sale of all minerals from said land covered by this contract, and lease, after deducting therefrom the cost of transportation and treatment." In these respects, the contract followed the language of chapter 148, p. 599, Laws of 1917, which authorized the commissioner to lease public lands for such a purpose (§ 1, appearing as Rem. Rev. Stat., § 8018), in substantially a prescribed form of contract (§ 3, appearing as Rem. Rev. Stat., § 8024), and to fix the terms and conditions thereof, except that the lessee must obligate himself to pay a royalty of between one and four per cent of moneys received, after deducting costs of transportation and treatment (§ 4, appearing as Rem. Rev. Stat., § 8025).

Several assignments of Allen's interest in this contract followed, and in 1924 Northwest became the owner thereof. It will be recalled that in that year Harbison-Walker held a majority interest in Northwest, and, as already related, it shortly thereafter acquired the full interest, although in the year 1927 it sold to General a two-fifths interest in Northwest.

In addition to the Moss claim, Northwest had, or has since acquired, interests in the following deposits of magnesite in a mass of dolomite rock, southwest of Chewelah: the *Finch* property, about seven times the size of the Moss claim, and just south of which is a substantial mill connected by tramway with Northwest's reduction plant located about

four miles east; the *Allen* property, about one-half mile south of the Finch plant and adjacent to the Moss claim; the *Keystone* property, which is about the same size as the Moss claim and is five miles, or more, southwest of the Finch plant and over mountainous terrain; and the *Red Marble* property, which is more than eight miles southwest of the Finch plant and is connected with the reduction plant by railroad.

Northwest did not immediately commence taking ore from the Moss claim after acquiring that right by its assumption of the 1917 Allen contract. Small operations were started in 1930. Typical of the royalty reports then submitted is the one for January, 1932. Northwest at that time remitted $13.35 and reported 359 net tons of magnesite ore extracted from the Moss claim during the previous month, together with the following figures in explanation, attested by the then general manager:

"Ore extracted in tons..................... 359.00
Net Profits per Ton........................ .93

*Total Net Profit*...........................$ 333.87
COSTS
Total Raw Mixed Burned................... 4,354.00 tons
Total Cost (Mining and Treating)...........$ 30,862.68
Cost per Ton.............................$ 7.09
Sale price per Ton........................$ 8.02

*Net Profit per Ton*........................$ .93"

Subsequent reports were submitted in substantially the same form.

It will be noted that royalties were submitted on the basis of total net profit, not on the basis of moneys received from the sale of Moss magnesite after deducting therefrom the cost of its transportation and treatment. Specifically, it will be noted that the cost of "mining" was deducted before arriving at the proceeds upon which the four per cent royalty was calculated. The evidence further disclosed that Northwest made no attempt to separate the cost of transporting and treating *Moss* ore; rather, the average cost and profit were assumed to be accurate as applied to the Moss

operation, or, in any event, were assumed to satisfy the requirements of the state contract.

Receipts of such remittances were acknowledged without protest by the state land commissioner until July, 1940, when he informed Northwest that, pending further information, he would not accept the June, 1940, remittance as final payment. In January, following, he wrote to Northwest, stating that he would not send a regular royalty receipt "until you have remitted on the basis of the contract."

One other matter requires comment before turning to the present demand made by the state. In 1934, certain letters were exchanged, and conversations had, between Mr. Garber, as manager of Northwest's operations at Chewelah, and Mr. A. C. Martin, then commissioner of public lands for the state of Washington. The import of these communications is crucial in the present dispute.

On March 28, 1934, Mr. Garber wrote to Commissioner Martin, requesting the latter's advice as to the procedure Northwest might employ to secure reduction of the royalty on Moss production, from four per cent to one per cent. Commissioner Martin replied on April 3rd that he thought it quite necessary that they "go into this matter some time in the near future and see what can be worked out."

Subsequently, apparently on April 19th, they did confer, and Mr. Martin suggested that they delay detailed consideration until such time as he could send a qualified mining man to Chewelah to go over the property.

On May 1, 1934, Mr. Garber wrote again to Commissioner Martin referring to the above conversation, and particularly to a statement therein by Mr. Martin that he intended, before any further discussion, to seek from the attorney general a clarification of certain legal questions pertaining to the matter. Garber pressed for a final decision by the commissioner, as affecting certain decisions which Northwest would have to make during the coming summer.

Sometime prior to May 14, 1934, Mr. W. L. Bell, who appears to have been a mining expert employed by the commissioner to make an investigation, sent the commis-

sioner his report, consisting of a letter and memorandum. Attorneys for both appellant and the respondents joined in offering these combined documents as an exhibit in the case. The letter, so far as is relevant here, read:

"I . . . enclose a memorandum giving my impressions of the Moss property. If within your power to redraw the contract, I think that would be advisable, so that the basis would be clear cut. The Company [Northwest] is clearly incorrect in deducting mining costs at present, as I told Mr. Garber. . . . My personal reaction is that their desire to increase Moss production should be helped along by some adjustment of their contract."

The memorandum which accompanied the letter was, in substance, as follows: Northwest was confronted with the problem of deciding whether to spend a substantial amount to develop the Moss claim and operate it in conjunction with the Finch property. It desired to work the state's property, that is, the Moss claim, on a large scale, in order to blend the ore therefrom, which had an excessive lime content, with Finch ore, so that the two ore bodies could be depleted together. The development contemplated surface stripping and trimming (removal of the overburden of trees, earth, and rock covering the ore lens), extension of tunnel and ore passes, and extension of tram facilities, on the state's property, to cost about $134,000. Certain disadvantages presented themselves: mining conditions were less favorable, in several respects, at the Moss claim than at other properties, and waste was higher, running forty-three per cent of gross tonnage as against thirty-three per cent at Finch. In the alternative, Northwest

". . . could open up the Keystone property [owned by Northwest]—6 miles distant—but this would require a large initial expense which is unnecessary in the case of the Moss property."

Mr. Bell reported that he thought it to the interest of the state that Commissioner Martin encourage this contemplated development of the Moss claim. As to royalties, he made the following comments:

"The present contract is loosely drawn as to terms of royalty, the basis being more suited to a mine shipping bullion, ore or concentrates to a third party whose settlement sheet would be evidence of the gross returns. . . . From the recent settlement [by the present lessee], it would appear that the strict terms of the contract have not been followed, inasmuch as the cost of mining has been deducted, thereby reducing the net profit on which the royalty is paid.

"The market value of the crude ore is a debatable subject and is complicated by the fact that the ultimate sale of the manufactured product is made in many forms and by another corporation of the family to which the Northwest Magnesite Co. belongs.

"For the above reasons a basis of settlement better suited to the conditions is desirable—one which would be definite and subject to only one interpretation during the life of the property. If the Land Commissioner is limited as to alteration of the terms of a contract by the maximum and minimum royalty percentages, then the present basis of calculation must be continued.

"The present royalty of 4% . . . amounts to 12 cents per ton, which does not appear to be excessive. Eliminating the mining cost in the deductions from gross value the royalty would be increased to perhaps 16 cents per ton. . . .

"The application for a decrease in royalty rate is only a part of the endeavor to reduce costs generally, which has embraced also the cost of power, taxes, and freight rates."

Mr. Bell concluded his report with this recommendation:

"A reduction of royalty on account of the large non-productive expense involved and general industrial conditions might well be made, not on the ground that the present rate is excessive but as measure of assistance to the lessee for the future benefit of the State. This might take the form of a credit or rebate against development and equipment, on account of royalty, in the discretion of the Land Commissioner."

On May 19, 1934, Commissioner Martin wrote to Mr. Garber, stating that he was in receipt of the Bell report and that he agreed with Mr. Bell's conclusion that the present contract did not fit the situation, especially as the ore being mined from the Moss claim was not similar to others which had a standard value, such as lead and zinc; that "the present

law does not apply to some of the valuable materials,—such is the case in the Moss claim." The commissioner also said in his letter that he contemplated fixing a value on the ore at the mine, and letting the percentage of royalty remain as before. In conclusion, he suggested a conference to determine a mutually acceptable plan "that would not be in conflict with the law."

On May 22nd, Mr. Garber replied by letter, concurring with the commissioner that there was legal difficulty and expressing his intention to visit Mr. Martin and seek the agreement suggested. Our only knowledge of the ensuing conference comes from the testimony of Mr. Garber at the trial of the case:

"Mr. RAFTIS: Now, Mr. Garber, upon receipt of that letter [May 19th] from Mr. A. C. Martin, Land Commissioner, I will ask you to state if thereafter you had occasion to again visit the office of Mr. Martin in Olympia? A. I did, yes sir. [Several weeks after receipt of the letter] . . . Q. . . . will you please state to the Court the discussion you had with him at that time. . . . A. I explained to Mr. Martin we wanted to make some immediate moves on developing either the Moss quarry or the Keystone or Red Marble quarry, and wondered what decision he had arrived at in regard to the matter of reduction of royalty. . . . And he explained to me that he was still of the opinion that it would not be policy for the State to make any reduction in amount—or percentage of royalty, but that he had had occasion to study very carefully Mr. Bell's report, and that he was in full accord with it . . . and that it should be put on a tonnage basis at so much per ton, and that he was then communicating with the Attorney General's office to draw a statute that would put it on this basis, and until such time as that was done he would allow the present method to stand as it had in the past. THE COURT: That's the present method of computing royalties? A. Yes sir, as we had always in the past. . . . MR. RAFTIS: Did that include salary and overhead at your plant, and taxes and all other general expense? A. Yes, sir, he understood that. Q. Did you discuss that in detail with him? A. Yes sir, I did. . . . Q. Did you discuss with him the treatment, what constituted treatment, what the problems were in treating? A. Very thoroughly. He had some question about that. Q. Now then, did you also discuss with

Mr. Martin at that visit, the question of your sale price of Northwest Magnesite Company? . . . A. I explained to him that the sale price f.o.b. Chewelah for refractories was $22.00, and we received $17.00 net ton f.o.b. cars for that material, and that if we had to set up sales organizations in all the leading steel cities and centers in the United States, maintain a credit department and be responsible for all collections, together with the extraordinary large amount of expense involved in the laboratory in developing magnesite for various applications in this country [sic]. Q. And at that time, Mr. Garber, did Mr. Martin, Land Commissioner, and you reach a definite agreement as to the method of calculating these royalties? A. He assured me that the present method of computation would stand until such time as he had the proper bill introduced into the Legislature which would put the product on a tonnage basis of so much a ton."

The only other evidence at hand as to the 1934 negotiations is a copy of a letter, dated September 17th, written by Mr. Garber to Commissioner Martin, the pertinent part of which read:

"Referring to past correspondence and previous verbal discussion relative to changes in our present lease covering the State Moss Claim—it is my intention to be in Olympia within the next 10 days or two weeks and at that time I would very much like to discuss this matter further with you."

It needs only to be added that Northwest did subsequently develop the state's property. The cost was even greater than the estimate, being about $220,000. Since then, the Moss claim has been worked on a large scale, yielding many thousands of tons of crude magnesite ore used in the production of standard deadburned grain magnesite.

We now turn to the claim made by the state and the procedure by which it was computed. In November, 1940, Mr. C. L. Stickney, a certified public accountant who was then auditor and cashier for the department of public lands, went to Pittsburgh at the direction of Commissioner Martin for the purpose of inspecting Northwest's books. He was given access to the records and was assisted in his investigation by Mr. J. C. Stivers, secretary of that company. Mr.

Stickney accepted the records of Northwest as accurate, but rejected its formula for computing royalties. At this point, it is necessary only to state that he determined (1) that certain disbursements were improperly allocated to costs of transportation and treatment, and (2) that receipts upon which royalties were properly due were twenty-two dollars per ton, the amount received by Harbison-Walker and General from their customers, rather than seventeen dollars per ton, the amount received by Northwest from those parent corporations.

Accordingly, Mr. Stickney prepared a detailed report and claim against Northwest, indicating deficiencies in royalty payments in each of eleven years, and interest upon individual deficiencies due, in a total amount of $62,487.94 as of October 31, 1940. Northwest refused payment, and in course of time this suit was brought, the cause tried, and the judgment entered from which this appeal was taken.

Under its several assignments of error, the state contends that the trial court erred (1) in refusing to grant it a judgment on the basis of the Allen contract of 1917; (2) in denying interest on amounts found to be due the state; (3) in denying the appellant state its costs; (4) in quashing service upon the respondents Harbison-Walker and General; (5) in dismissing *with prejudice* the appellant's cause of action against those two respondents; (6) in refusing to grant the state's motion for reconsideration or for a new trial; and (7) in refusing to admit certain testimony and papers offered by the state at the second hearing, in September, 1944.

It is the first of these assignments which presents for our consideration almost the entire subject matter of this litigation.

As has been noted, the trial court predicated its judgment on what it held to be an agreement concluded in 1934. In its memorandum opinion and decision, the court said:

. "According to the testimony of witness, Garber, the Land Commissioner *agreed to a deduction as treatment and transportation of all costs of production* including quarrying and reduction, and including removal of over-burden. . . .

" . . . the accounting must be based upon the agreement and arrangement made in 1934 between the State Land Commissioner and the defendant Northwest Magnesite Company.

"Under that agreement the defendant [Northwest] is entitled to deduct all quarry costs including so called mining, stripping over-burden, mucking, cobbing and crushing and milling and transportation costs, including administration and management costs, social security costs, and insurance and taxes paid on account of operation of the States' property . . . and depreciation." (Italics ours.)

At the outset, we note that the *only* evidence of any agreement between Commissioner Martin and Mr. Garber is that summarized in our statement of the case. We shall accept the trial court's conclusion that this was sufficient proof of an oral promise by the commissioner, but we cannot accept the trial court's view that this promise amounted to an agreement between the parties, or that it was in effect a determination that "costs of transportation and treatment" meant costs of production. Mr. Garber said only that Mr. Martin assured him that the *present method of computation* would stand until a certain bill was presented to the legislature. That method of computation was, as is conceded by Northwest, four per cent of net profits after taxes and royalties.

The question we shall consider, therefore, is whether the state is bound by an oral promise of the commissioner of public lands that he would allow Northwest to remit mining royalties on the basis of net profits, in substitution for the provision of the written contract of 1917 obligating Northwest to pay such royalties on the basis of gross receipts less the costs of transportation and treatment.

The trial court deemed the state to be bound, for two principal reasons:

(1) It believed, as apparently did Commissioner Martin, that the 1917 contract and the statutes under which it was drafted were inappropriate to the Moss operation. The memorandum opinion comments:

"There is no mining here, in the sense that term is used in the Statute; this operation is an open quarry, an excava-

tion, more like the operation of a clay pit than a mining enterprise."

The memorandum opinion further states that the statute was intended to deal with metallic ores and minerals, and, by implication, that magnesite ore is not properly classified as a "valuable mineral." It also points out that "treatment" is not defined either in the statute or in the written contract. Hence, the court concluded that it was left to the discretion of the commissioner to determine the appropriate deductions to be made, as costs of transportation and treatment, from the gross receipts of Northwest.

(2) The trial court concluded that "the State is in Court in its proprietary, as distinguished from its sovereign, capacity and will receive the same consideration its most humble citizen would receive"; that in 1934 Northwest was ready to abandon the 1917 contract unless an agreement were reached as to its liability thereunder; that an agreement was reached; that Northwest, in reliance thereon, expended great sums of money to make the property commercially operative; and that the state, having received more than seventy thousand dollars in royalties, could not accept the benefit of its bargain and then come into court and repudiate the contract. In short, the court held that the state was estopped to claim any sums except in accordance with the oral promise of 1934.

We shall examine these conclusions separately. The first, numbered (1) above, has to do with the nature of the operation and the extent of the commissioner's discretion with reference thereto.

While, as the court concluded, the formula used for computing royalties, as provided in the 1917 contract, may not have been expedient as applied to Northwest's operation of the Moss claim, we do not agree that the commissioner had the broad powers conceded to him by the trial court.

Our point of departure from the view of the trial court on this issue is in the determination of the nature of the operations conducted by Northwest on the Moss claim, and the character of the product derived therefrom. In our

opinion, the operation was a *mining* enterprise, and the ore extracted thereby was a *valuable mineral* within the intendment of the legislature.

The only mining expert to testify at the trial, Mr. C. A. Sargent, mining superintendent for Northwest, stated that, generally, "separation of mineral from the earth is mining"; "the removal of a mineral from its place of rest where nature put it, is termed mining"; "mining is a very broad term, and it takes in dredging, placer mining, any means by which you extract the mineral from its natural resting place. . . As such it includes quarrying." His definition is supported by the authorities we have examined.

In 36 Am. Jur. 281, Mines and Minerals, § 2, it is said:

"While the word 'mine' was originally employed to designate an underground working for the excavation of minerals, consisting of pits, shafts, levels, tunnels, etc., it has latterly received an enlarged meaning and is now commonly regarded as including open cuts, quarries, etc., by which such substances as beds of clay, ironstone, and limestone are extracted."

The usage of the term "mining" in Rem. Rev. Stat., § 8018 *et seq.*, and the absence of any other statutory provision for leasing mineral rights to public lands (except coal, petroleum, and natural gas), indicate to us that the legislature intended that the act under which the 1917 contract for mining was authorized should embrace all forms of mining activity. In extracting mineral ore "in, on or under the land," Northwest is engaged in mining, within the meaning of its contract and the statutes above mentioned.

We likewise conclude that magnesite is a valuable mineral. The word "valuable," as thus used, has a modified meaning not normally associated with that word; it connotes only mineral matter worth exploiting. That no special importance was attached to the word "valuable" by the legislature, appears from the interchangeable references, in Rem. Rev. Stat., §§ 8018, 8020, 8021, 8024, 8025, and 8027, to "valuable minerals," "precious minerals," and "minerals."

The following authoritative definition of "valuable min-

eral deposit" lends support to our interpretation of the statutes in question:

"Whatever is recognized as a mineral, by the standard authorities on the subject, whether metallic or other substance, and is found in such quantity and quality as to render the land more valuable on that account than for agricultural purposes is a valuable mineral deposit within the purview of the mining act." A. H. Ricketts, American Mining Law (1943) 64, § 8.

The above authority cites, as examples, granite and rock quarries. In accord is 44 Words & Phrases (Perm. ed.) 31, citing, among other examples, marble, slate, limestone, and building stone.

A relevant question was before this court in *State ex rel. Atkinson v. Evans*, 46 Wash. 219, 89 Pac. 565, 10 L. R. A. (N.S.) 1163, in which case it was held that deposits of limestone, silica, silicated rock, and clay were "valuable deposits of minerals," as that term was used in Art. II, § 33, of our state constitution (the same descriptive language appearing in Rem. Rev. Stat. (Sup.), § 10581 [P.P.C. § 257-1] (b) ).

That magnesite is a "valuable mineral" in the broad sense in which the legislature used that phrase in the statute, appears from A. F. Taggart, Handbook of Mineral Dressing (1945) 3-61, Art. 25, as well as from the evidence in this case.

We consider next that portion of the trial court's first conclusion having reference to the discretion of the land commissioner to determine the proper deductions to be made.

It is, of course, unfortunate that the commissioner should have expressed his opinion to Mr. Garber that the statutes in force were not applicable to the Moss operation. However, such expression of opinion as to the law, the facts being equally well known to both parties, cannot preclude the state from asserting the true effect of the statutes and the contract of 1917. *Turner v. Spokane County*, 150 Wash. 524, 273 Pac. 959.

This being the situation, the commissioner was bound to act in compliance with the 1917 contract and the statutes relevant to the Moss claim.

█ Proceeding further with reference to that same conclusion of the trial court, we are of the considered view that the commissioner had no authority to release or discharge Northwest from liability for royalty deficiencies accruing between 1930 and June, 1934, or to enter into the oral "agreement." The 1917 contract provided for written notice as a condition to its termination by either party. The only statute in force in 1934 empowering the commissioner to make any modification of mining contracts was Rem. Rev. Stat., § 7797-195 [P.P.C. § 940-75], which authorized him to recall any lease, contract, or deed "for the purpose of correcting mistakes or errors, or supplying omissions." Other statutes then in force provided that a new mining contract with the lessee could be made by the land commissioner only by means of a writing, in substantially a prescribed form; and, particularly, that he must provide therein for the payment to the state

" . . . of a royalty of not less than one per cent, nor more than four per cent of all moneys received from the sale of minerals from the lands covered by the contract, after deducting therefrom the cost of transporting the ore or minerals from the mine or mines to market, or to any smelter, concentrating plant or other place of treatment, and the cost of treatment. . . . " Rem. Rev. Stat., §§ 7797-161, 7797-162 [P.P.C. §§ 940-291, 940-293].

While the commissioner did have the implied authority to make a reasonable administrative determination of the meaning of "transportation and treatment," as applied to the Moss operation, there is nothing in the record to show that the commissioner did so; and there is, on the other hand, strong circumstantial evidence that no such determination was ever made by the department of public lands.

The second conclusion by the trial court, numbered (2) above, was that the state was appearing in its proprietary, as distinguished from its governmental, capacity; and that,

for reasons of equitable estoppel, the state cannot now deny the oral promise of the commissioner. Respondents now make the same contention.

We consider it incorrect to say that, for purposes of applying the doctrine of equitable estoppel, the state will, in this case, "receive the same consideration its most humble citizen would receive." The state of Washington, in its ownership of granted school lands, holds and disposes of them in its governmental, as distinguished from its proprietary, capacity. *Soundview Pulp Co. v. Taylor,* 21 Wn. (2d) 261, 150 P. (2d) 839 (overruled on another point in *Case v. Bowles,* 327 U. S. 92, 90 L. Ed. (Adv. Op.) 398, 66 S. Ct. 438). See state constitution, Art. IX, §§ 1, 3; Art. XVI, §§ 2, 3; amendment 1 (Art. XVI, § 5).

Proceeding upon this principle, we may nevertheless concede, *arguendo,* that estoppel may, in exceptional cases, be asserted against the state even when it has acted in other than a "proprietary" capacity.

We will further concede that the doctrine of estoppel may properly extend to an assurance or promise relating to the future. See I Restatement of the Law, Contracts, § 90; *Fried v. Fisher,* 328 Pa. 497, 196 Atl. 39, 115 A. L. R. 147, and extensive annotation at p. 152; 31 C. J. S. 289 *et seq.,* Estoppel, § 80.

However, despite these concessions, three reasons induce us to hold against the trial court's second conclusion: (1) estoppel may not be asserted to enforce a promise which is contrary to statute and to the policy thereof; (2) estoppel may not be asserted to enforce the promise of one who had no authority to enter into that undertaking on behalf of the state; and (3) the evidence does not present such a case of injustice as requires application of the doctrine of estoppel.

We shall consider each of these three propositions in turn.

First, as to proposition (1), it is the general rule that a contract which is contrary to the terms and policy of an express legislative enactment is illegal and unenforcible. 6 Williston on Contracts 5021, § 1768; see 2 Restatement of the Law, Contracts, § 580.

■ . We can draw no other inference from Rem. Rev. Stat., § 8025, or its successor, § 7797-162, than that the commissioner of public lands must, in every contract for mining, require for the state a royalty of a fixed percentage, between one and four per cent, of the lessee's gross receipts from the sale of minerals from state land, after deduction of costs of transportation and treatment.

■ Furthermore, we can draw no other inference from Rem. Rev. Stat., § 8024, or its successor, § 7797-161, and from § 7797-195, than that neither the commissioner nor the lessee can lawfully modify the terms of a contract for mining, once entered into, except in accordance with the terms of that contract, unless it be to correct errors therein.

■ We think it was the policy of the legislature to withdraw from any discretion on the part of the commissioner these important particulars of the statutory contract for mining.

■ It follows, from what we have said, that the promise or "agreement" of 1934 was not authorized by our statutes then in force, and was indeed contrary to the policy of those legislative enactments, and, hence, was illegal.

■ The contract being illegal, the respondents may not invoke the doctrine of estoppel to enforce it. As this court said in *Reed v. Johnson,* 27 Wash. 42, 67 Pac. 381, 57 L. R. A. 404:

"The nonenforcement of illegal contracts is a matter of common public interest, and a party to such contract cannot waive his right to set up the defense of illegality in an action thereon by the other party. . . . it becomes the duty of the court to refuse to entertain the action. . . . The appellants are not estopped to raise the illegality of the contract because of their course of dealing with respondents under the contract. *Validity cannot be given to an illegal contract through any* principle of estoppel." (Italics ours.)

Accord: *McCutcheon v. Merz Capsule Co.,* (C.C.A. 6th) 71 Fed. 787, 31 L. R. A. 415; *Red Rover Copper Co. v. Industrial Comm.,* 58 Ariz. 203, 118 P. (2d) 1102; *Commissioner of Banks v. Cosmopolitan Trust Co.,* 253 Mass. 205,

148 N. E. 609, 41 A. L. R. 658; *Southern R. Co. v. Lewis & Adcock Co.*, 139 Tenn. 37, 201 S. W. 131, L. R. A. 1918C, 976.

"And, of course, a party cannot be estopped to deny the formation of a contract which would be invalid as against public policy or in violation of statute." 1 Williston on Contracts 314, § 98.

"Accordingly, one cannot ordinarily be estopped to assert the direct violation of a decisive prohibition of statute or the unenforceability of a contract contrary to law." 19 Am. Jur. 638, Estoppel, § 39.

"Where the contract is void as against public policy or against an express mandate of the law, a person who has accepted a benefit thereunder will not be estopped to defend against the contract when it is sought to be enforced against him." 31 C. J. S. 352, Estoppel, § 110a.

"The doctrine of estoppel will not be applied . . . to frustrate the purpose of [laws of the Federal or a state government] or thwart its public policy." 31 C. J. S. 412, Estoppel, § 140b.

This rule is particularly applicable to public contracts. *State v. Pullman,* 23 Wash. 583, 63 Pac. 265, 83 Am. St. 836; *Brougham v. Seattle,* 194 Wash. 1, 76 P. (2d) 1013.

Second, as to proposition (2), relating to the promise of one who had no legal authority to enter into the particular undertaking: The doctrine of estoppel cannot be invoked to enforce the promise of an officer or agent against a corporation or government, if such representative person had no legal capacity or power to enter into such an obligation. *State ex rel. Nat. Bank of Tacoma v. Tacoma,* 97 Wash. 190, 166 Pac. 66; *State ex rel. Hubbard v. Seattle,* 135 Wash. 505, 238 Pac. 1; *State ex rel. Department of Finance, Budget & Business v. Thurston County,* 6 Wn. (2d) 633, 108 P. (2d) 828; *Strand v. State,* 16 Wn. (2d) 107, 119, 132 P. (2d) 1011, 1017; 19 Am. Jur. 644, Estoppel, § 45.

"A state cannot be estopped by the unauthorized acts or representations of its officers." 19 Am. Jur. 818, Estoppel, § 166.

In a case similar to the one before us, this court aptly remarked:

"Nor are the acts of the former commissioner in any sense an estoppel. An officer of the state can, under certain circumstances, condone past offenses against the law, but he cannot grant indulgences to commit new or continuing offenses." *State ex rel. Fishback v. Globe Casket & Undertaking Co.,* 82 Wash. 124, 143 Pac. 878, 1915B, L. R. A. 976.

This rule may sometimes work harshly, but we do not think that such is the case here. Not only did Garber, manager for Northwest, have constructive notice of the statutory limitations upon the authority of the public officer with whom he dealt, but also there is every indication from the evidence that he had actual knowledge of the legal impediments to a change in the terms of the 1917 contract.

Third, as to proposition (3), relating to proof of the elements of estoppel: We are satisfied, from the record in this case, that respondents have not established grounds of estoppel, in any event not to the extent that it is clearly necessary to invoke the doctrine in order to prevent manifest injustice.

It is not essential, for this purpose, to distinguish between the requirements of promissory estoppel, as defined by 1 Restatement of the Law, Contracts, § 90, referred to above, and the requirements of equitable estoppel as defined in *Carruthers v. Whitney,* 56 Wash. 327, 105 Pac. 831, 134 Am. St. 1114, as follows:

"The well-understood idea of equitable estoppel is that, where a person wrongfully or negligently by his acts or representations causes another who has a right to rely upon such acts or representations to change his condition for the worse, the party making such representations shall not be allowed to plead their falsity for his own advantage."

In either case, the representation or promise must be relied upon by the party asserting estoppel, and that reliance must have induced action or forbearance of a definite and substantial nature, or, as was stated in the *Carruthers* case, *supra,* he must "change his condition for the worse," so that it would be unjust for the other party to repudiate the representation or promise.

The questions of fact which we shall consider, upon this issue, are (a) whether Northwest did rely upon the 1934

promise, and (b) whether Northwest was unconscionably injured by the action it took thereafter.

Upon the first question, designated as (a), it will be recalled that, according to Mr. Bell's report, offered as evidence by the respondents, royalties in 1934 amounted to about twelve cents per ton, or only about .007 of the price received by Northwest for its magnesite, and that Bell estimated that Northwest would have to pay four cents more per ton if royalties were computed without deducting mining costs. The alleged concession in 1934 was, in short, a negligible economic factor in Northwest's determination to develop the Moss claim rather than the Keystone property. This is borne out by Mr. Sargent's testimony that he understood that the operation of the Moss claim was preferred to that of Keystone because of the geographical convenience of Moss; and, while Mr. Garber testified that he would have recommended development of the Keystone property if the oral promise of Commissioner Martin had not been made, he also testified that "we received permission to go ahead and develop the Moss property instead of the Keystone, due to geographical location." It is significant that this suppositional recommendation was the only "action" taken by any officer of respondents having knowledge of the promise.

 We find no evidence that Northwest intended to abandon the Moss claim. Mr. Garber never communicated the fact of an agreement to the Pittsburgh office, where royalty returns were prepared, and no material change was ever made in the method of calculating royalties. Our doubt that Northwest at any time relied upon the commissioner's promise in 1934 is fortified by the fact that this so-called agreement was not pleaded by the respondents in answer to the state's complaint.

Upon the second question of fact, designated above as (b), we will say that, quite apart from the question of reliance, there is no evidence that Northwest was injured by developing the Moss property. The substantial development work which Northwest contemplated in 1934 was necessary if the Moss claim was to be operated. Admittedly,

the admixture of Moss and Finch ores was beneficial to the state, but, according to the Bell report, it was also a favorable arrangement for Northwest. Mining costs and waste may have been higher than at other properties, but it appears, indirectly, from the evidence that during the 1930-1943 period Northwest made a profit from operation of the Moss claim in excess of $2,100,000. There is no "unconscionable injury."

Lastly, and contrary to the trial court's implication, mere payment of moneys as royalties cannot work an estoppel against the lessor. See *Bellingham Securities Syndicate v. Bellingham Coal Mines,* 13 Wn. (2d) 370, 125 P. (2d) 668.

Enough has been said to indicate our view that respondents have not proved any "clear necessity" or "manifest injustice" in this case. For the several reasons hereinbefore stated, we hold that the state is not estopped to deny the authority of the land commissioner to make the verbal assurance given to Mr. Garber in 1934, and that the trial court erred in giving judgment on the basis of the oral "agreement" of that year.

As a result of this conclusion, we are now required to ascertain the true measure of respondents' liability under the 1917 contract for mining, of which Northwest is the assignee, and under which it assumes the right to extract magnesite ore from the Moss claim. More exactly, the immediate problem for judicial decision is the meaning of the formula

". . . four per cent of all *moneys received* from the sale of all minerals from said lands covered by this contract, and lease, after deducting therefrom the *cost of transportation and treatment.*"

as applied to Northwest's operation of the Moss quarry. The two phrases in dispute are italicized above. As the arguments concerning them are unrelated, we may conveniently separate them in the discussion.

The appellant state asserts that "moneys received" means, in this case, the twenty-two dollars per ton, f.o.b. Chewelah, received by the parent corporations, Harbison-Walker and

General, from the sale of magnesite to other consumers, rather than the seventeen dollars per ton, f.o.b. Chewelah, received by the domestic subsidiary, Northwest, from those two concerns.

■ One contention is that "moneys received," as used in the statute and contract, is equivalent to "ultimate market price." With that argument we may at once say we disagree. It is the *lessee* who undertakes to pay a percentage of moneys received from the sale of the mineral, and, in the absence of any qualifying words, it seems plain that the statute and contract refer to the lessee's sale and the moneys received by it. The evidence in this case corroborates our conclusion, for it indicates that the normal sale of ore is to a smelter, and that royalties are customarily paid on the basis of smelter returns, or "moneys received" by the mine operator. The state did not offer evidence at the trial, nor did it adduce authority in argument, for its proposition that the legislature intended, by the language "moneys received," to mean moneys received by the ultimate marketer.

The more difficult question is whether the corporate relations of respondents render the actual price received by Northwest a paper figure which the state need not accept for purposes of royalties.

■ It has heretofore been shown that all sales by Northwest are made to, or through, Harbison-Walker and General, and that those corporations own and actively control Northwest; further, that, between 1928 and the time of trial, including the period when Moss ore was quarried, the price allowed by those corporations to Northwest was seventeen dollars a ton, a price which remained static during depression and war boom. These circumstances alone would ordinarily excite suspicion.

Other evidence, however, points away from abuse of Northwest's corporate identity, so far as price received is concerned. The exhibits show that the *market price* of magnesite likewise remained comparatively static, at first, presumably, because the protective tariff provided an assured market at a price just below the cost of importation,

and, later, because of a price ceiling imposed by the Federal office of price administration.

The state failed to prove any combination between Harbison-Walker and General, or that they enjoyed a United States monopoly from which it might appear that they were responsible for the static market price.

Furthermore, the state did not allege that the price allowed to Northwest was unreasonable, and two facts in evidence tend to prove it was not unreasonable: First, it appears that Northwest pays all of its own expenses and has managed to earn a substantial profit; and, second, the terms of the 1918 marketing agreement between Northwest and Harbison-Walker, then independent concerns, indicate that the percentage of ultimate market price now returned to Northwest is not disproportionate to that which it received while it was independent.

Other facts are significant in this context. It appears that the state's royalty is only a small part of the production cost of Moss ore; that Moss output is a comparatively minor part of Northwest's output; and that Northwest is a small enterprise in comparison with the businesses of Harbison-Walker and General. Thus the royalty obligation has only a remote bearing upon the conduct of Northwest's business, and particularly upon the determination by Harbison-Walker and General of the price to be allowed Northwest for its deadburned grain magnesite. In this connection, it is significant to us that the price of seventeen dollars was set long prior to Northwest's decision to work the Moss claim, and that there was no change in price after that decision was made and carried out.

Hence, while we might look with some suspicion upon the artificial price provided in the circumstances, we find no evidence of abuse of Northwest's corporate identity for the purpose of minimizing royalties. Counsel for the state must have reached the same conclusion, for in their reply brief they say:

"Let it be plainly understood that the state does not claim that there was anything wrong with the corporate arrangements or corporate structures of respondents."

We conclude that the evidence preponderates in favor of the trial court's decision that the price which Northwest received from its parent corporations should be accepted for purposes of calculating the amount of royalties presently owing to the state.

The second phrase, "cost of transportation and treatment," as contained in the royalty formula, is likewise attendant with some difficulty of interpretation. We can narrow our consideration to a few concrete questions, however, because of substantial concessions made by both parties to this controversy.

The items here in dispute are, roughly, those incurred at the ore site, including costs of exploratory diamond drilling, surface stripping, and extensions of tunnel, ore passes, and tram facilities, blasting, separation of usable ore, and incidental expense prorated to those operations. Our present problem is to determine, in each instance, whether the operation is *treatment,* within the meaning of the statute and the contract drawn pursuant thereto.

Generally, we find that "treatment" is a very broad term. Mr. Frank Sether, an experienced official of the department of public lands, testified that employees of the department had never been able to agree upon a satisfactory definition of the term. Mr. Sargent, the expert witness for respondents, testified that:

"Treatment is that process by which a mineral or ore is placed in proper chemical and physical condition to be of marketable value."

A bulletin of the United States bureau of mines is quoted by counsel to this effect: "Treatment" means reduction of ores by any process whereby the valuable constituent is recovered.

One other statement, taken from a reliable authority, will illustrate the generality of the usage of the term. In 15 Encyclopaedia Britannica (1946) 311, Metallurgy, subdivision "Ore Treatment," it is said:

"Where Metallurgy Begins.—Beginning with the quarry or mine, it is difficult to determine precisely where the

province of mining ends, and that of metallurgy begins.
. . .

". . . In mining operations efforts are made to separate the mineral as much as possible from the adjacent valueless rock or 'gangue,' but usually the separation is very incomplete until special processes are applied to the product. These separating or 'ore dressing' processes depend on differences of properties between the mineral and the gangue." (p. 311)

"In ore treatment the primary object is concentration. The metal occurs in the product of the mine frequently in a widely dispersed or 'diluted' form and it is essential to reduce the weight and bulk of the material to the lowest possible amount." (p. 312)

The question then arises as to what are these physical and chemical processes by which ore is concentrated or reduced. Mr. A. F. Taggart, Professor of Mineral Dressing, School of Mines, Columbia University, published in 1945 an elaborate and careful work, styled Handbook of Mineral Dressing, in which, at p. 1-01, § 1, he says:

"Mineral dressing is the art of treating the crude crust of the earth to produce therefrom the primary-consumer derivatives. The essential operation in all such processes is separation of one or more valuable desired constituents of the crude from the undesired contaminants with which it occurs associated. Mineral dressing has three principal branches, viz: ORE DRESSING, which comprises the methods of separation of solid inorganic crudes by means which do not effect substantial chemical change; EXTRACTIVE METALLURGY, which utilizes chemical reaction for separation of the constituents of solid inorganic crudes; and FUEL TECHNOLOGY. . . .

"Mineral dressing is to be looked upon primarily as a manufacturing process for which the raw material is the crude, and the finished product is that derivative thereof which best supplies the demand of the primary consumer.
. . .

"DEFINITIONS. A CRUDE is any mixture of minerals in the form in which it occurs as a part of the earth's crust. An ORE is a solid crude containing a valuable constituent in such amounts as to constitute a promise of possible profit in extraction, treatment, and sale. The valuable constituent of an ore is ordinarily called VALUABLE MINERAL, or often just MINERAL; . . . The valuable product of the

ore-dressing treatment is called CONCENTRATE; the discarded waste is TAILING."

Corroborative of this statement is the following explanation of ore dressing, found in Ricketts, Mining Law, 33:

"When the miner hoists his ore to the surface, . . . the valuable mineral is always associated with minerals of no value. The province of the ore dresser is to separate the 'values' from the waste; . . . The province of the metallurgist is to extract the pure metal from the concentrates by chemical means with or without the aid of heat."

It further appears that hand sorting or picking is an established procedure of ore dressing. R. H. Richardson, Ore Dressing, vol. 1, chapter 13.

■ We infer from these sources of information, and from the definitions previously quoted, that "treatment," generally, is distinct from *extraction* of ore from the earth, but includes at least a part of the general operation of mineral dressing.

■ We turn now to the particular case before us. As to the initial operations of exploration and development, there is no question; they fit neither the witness Sargent's definition nor that indicated by the authorities just cited. Mr. Sargent testified that stripping overburden from the ore lens was development. Later, however, he said it was transportation or mining, "Probably would be both, I should say," but it is plain that, at that point, he was confused as to accounting classification. We think the trial court erred in allowing Northwest to deduct costs of development as part of "transportation and treatment."

As to the expense of blasting, reblasting, and ore and waste handling at the quarry, we likewise have little doubt that it is not a part of the cost of transportation and treatment, but is rather a cost of mining, exploitation, or extraction. Mr. Sargent did testify that blasting was treatment, or "a type of treatment," because it was selective; but he conceded that, generally, separation of mineral from the earth was mining, and certainly his first statement was inconsistent with his definition of treatment.

While we have arrived at these conclusions after an independent analysis of the evidence and the reference matter cited, we may add that it is our recollection that counsel for respondents conceded at the most recent argument that, from a legal standpoint, these operations were not treatment.

The remaining item, an important one, is the cost of *cobbing*, or breaking chunks of commingled dolomite, quartz, and magnesite, and *sorting* ore suitable for further processing. This cobbing was originally done by hand, with hammers, and the sorting was likewise by hand. Later, pneumatic drills were put to use to assist in the breaking process. Still later, a froth flotation mill was constructed to accomplish the sorting mechanically. At the time of trial, a heavy media mill was being installed, so that the ore, passing through crushers and then through the heavy media, would be mechanically cobbed and sorted, and the original hand labor entirely eliminated. There is apparently no contention that the cost of these mechanical operations is not a cost of "treatment," but the state contends that the cost of cobbing and sorting by hand is a cost of "mining."

Whether this cobbing and sorting, as conducted at the Moss quarry, constituted parts of a *mining operation* where "efforts are made to separate the mineral as much as possible from the adjacent valueless rock," as mentioned in Encyclopaedia Britannica, and as expressly distinguished from treatment in Costigan on Mining Law, 107, § 30 (c), or whether it is *ore dressing*, by which the values are separated from waste, as defined by Mr. Rickets, and as such should be considered a part of the general operation of *treatment*, is a question which we do not consider ourselves competent to answer without literal recourse to the rules of judicial procedure.

On this point, Mr. Sargent's testimony was clear and convincing. He testified that "mucking," as Northwest termed the operation, was "entirely treatment"; that "cobbing is not related to mining." His statement is supported by the

afore-quoted Handbook of Mineral Dressing, at 3-61, *Magnesite*:

"Treatment. Careful cobbing and sorting are necessary at most mines. Frequently 2 tons are rejected out of 3 tons mined, yet mechanical concentration was not attempted commercially until 1940. Froth flotation is feasible for some ores . . . and sink-float for others."

The state offered no evidence to the contrary. On the face of the record, then, the preponderance of the evidence was against the state's contention that Northwest was liable for royalties on money expended for "mucking," and we must therefore sustain the holding of the trial court in favor of respondents on that item.

The character of incidental expenses prorated by Mr. Stickney, the accountant, and Mr. Stivers to these several operations is determined by our decision as to the items just considered, and no separate discussion is necessary as to them.

Thus we have fully disposed of the first assignment of error. Upon this assignment, we affirm the trial court's judgment in so far as it requires royalties to be computed on the basis of the price received by Northwest and permits Northwest to deduct the cost of cobbing and sorting as "treatment," before computing royalties. We overrule the trial court's judgment, however, in so far as it is predicated upon the oral promise of the commissioner of public lands and permits Northwest to deduct, as "costs of transportation and treatment," the expense of exploration, development, and ore extraction, before computing royalties.

Other questions yet remain for consideration.

■■■ Appellant complains that the court erred in refusing it interest on sums found owing by respondents. It takes the position that the additional royalties due from Northwest are a liquidated debt. With this contention we do not agree.

There was an honest dispute between the parties to the contract as to the meaning of the terms "moneys received" and "transportation and treatment," so that even an approximate measure of liability could not be ascertained by

the lessee until that dispute was adjudicated. Neither the judgment of the trial court nor the measure of delinquent royalties arrived at by this court represents a debt which might have been determined without resort to compromise or else to a lawsuit. In these circumstances, the state has no claim upon the respondents for interest accruing prior to judgment. *Wright v. Tacoma*, 87 Wash. 334, 151 Pac. 837; *Fowler v. Gray*, 141 Wash. 372, 251 Pac. 570; *Ferber v. Wisen*, 195 Wash. 603, 82 P. (2d) 139; *Fiorito v. Goerig*, 27 Wn. (2d) 615, 179 P. (2d) 316. See 40 C. J. 1027, 1028, Mines and Minerals, § 633.

 Appellant also contends that the court erred in denying costs to it. The basis for this contention is found in the attorney general's argument that this was an action on a contract, for a definite sum due, which we infer is equivalent to a contention that this is an action at law. See Rem. Rev. Stat., § 476 [P.P.C. § 22-3].

The trial court held, however, that this was an equitable action for an accounting of royalties alleged to be due and unpaid, a decision emphasized by the omission from the record of any formal findings of fact. The state did not appeal from that determination, but that fact is not material now, for we are agreed that this complex accounting was an appropriate remedy to be invoked in a court of equity. In such event, costs were within the discretion of the trial court, and we see no abuse of that discretion in its determination to deny both parties to this action any recovery of costs. Rem. Rev. Stat., § 493 [P.P.C. § 22-37]; *Weiffenbach v. Puget Sound Bridge & Dredging Co.*, 108 Wash. 455, 184 Pac. 321; *Hirsch v. Consolidated Films Corp.*, 134 Wash. 682, 236 Pac. 279; *Spencer v. Patton*, 179 Wash. 50, 35 P. (2d) 768; *Sibbald v. Chehalis Sav. & Loan Ass'n*, 6 Wn. (2d) 203, 107 P. (2d) 333.

 It is next argued that the trial court erred in refusing to grant the state's motion for reconsideration or for a new trial, at the supplemental hearing in September, 1944, and, closely connected with that assignment of error, that the court erred in refusing to admit certain evidence offered at that time.

The only reasons proffered for a new trial were (1) a statement made by the special assistant attorney general, who appeared at the second hearing, that he was dissatisfied with the record and that he "would try this case altogether different," and (2) the following offers of evidence: The state offered additional correspondence from the files of the department of public lands which tended to show that negotiations between Commissioner Martin and Mr. Garber extended later into 1934 than was shown at the trial, but which otherwise related to events subsequent to the Stickney investigation, and the testimony of former Commissioner Martin that he was never informed of the deductions being taken by Northwest, and only tacitly consented, in 1934, to permit that company to continue remittances on the original basis "subject to audit."

Counsel for Northwest objected to the offer and to the motion, pointing out that the evidence offered would reopen issues before the court at the original trial in 1943 and not relevant to the matter of an accounting in accordance with the terms of the memorandum opinion. The court sustained the objection on the ground that the offer was in effect a motion for a new trial, and that there was no showing of diligence or explanation why the evidence was not introduced at the trial in 1943. Upon consideration of these matters, we are convinced that no adequate grounds were presented to justify either the admission of the evidence or a new trial.

The remaining question is whether the trial court correctly disposed of the case against the respondents Harbison-Walker and General.

The trial court ordered that

". . . the purported service of summons heretofore attempted to be made upon the said [respondents Harbison-Walker and General] be and the same is hereby quashed, set aside and held for naught, and that the within cause of action be, and the same is hereby dismissed *with prejudice* as to the said [respondents]." (Italics ours.)

The requirements for service of process upon a foreign corporation are that it be "doing business within

this state," and that service be made upon its "agent, cashier or secretary." Rem. Rev. Stat., § 226 [P.P.C. § 2-13] (9).

 As a basis for jurisdiction over Harbison-Walker and General, appellant asserts that those two corporations are the actual operators under the 1917 contract with the state, "except the actual mining which they do in Northwest's name." Further, it asserts that, since those two foreign corporations acquired Northwest's capital stock in order to manage Northwest in the interests of their own businesses, they are "doing business" within this state, under the doctrine of *Bankers Holding Corp. v. Maybury,* 161 Wash. 681, 297 Pac. 740, 75 A. L. R. 1237.

We cannot agree with either assertion. The principle upon which we proceed is that a corporation exists as an organization distinct from the personality of its shareholders. This separate organization, with its distinctive privileges and liabilities, is a legal fact, and not a fiction to be disregarded when convenient. The concentration of its ownership in the hands of one or two principal shareholders does not, *ipso jure,* dispel those corporate characteristics of the organization. For these reasons, it is the general rule that a foreign corporation which holds a controlling interest in a subsidiary corporation doing business within a particular state is not thereby subject to service of process through service upon an agent of the subsidiary within that state. *Cannon Mfg. Co. v. Cudahy Packing Co.,* 267 U. S. 333, 69 L. Ed. 634, and footnote added thereto supporting the court's conclusion, 45 S. Ct. 250; *Hazeltine Corp. v. General Electric Co.,* (D. C. Md.) 19 F. Supp. 898; Annotation, 75 A. L. R. 1242; Ballantine, Separate Entity of Parent and Subsidiary Corporations, 14 Cal. L. Rev. 12; Cf. case note, 30 Mich. L. Rev. 464.

 The exceptions to the rule, based upon the facts in individual cases, are not easily summarized into a set formula for ready reference. A clear case for ignoring the corporate form of the subsidiary, for purposes of serving process, is set forth in *State ex rel. New York Oil Co. v. Superior Court,* 143 Wash. 641, 255 Pac. 1030. That case and many others discussed by the authorities mentioned

above, confirm the conclusion reached by Professor Ballantine, with which we agree, that whether the courts will disregard the corporate form is ultimately a question of whether there is good faith and honesty in the use of corporate privilege for legitimate ends. See *Sommer v. Yakima Motor Coach Co.,* 174 Wash. 638, 26 P. (2d) 92; *McCurdy v. Spokane Western Power & Traction Co.,* 174 Wash. 470, 24 P. (2d) 1075.

In the evidence before us there is no intimation of dishonesty or bad faith on the part of the two foreign corporations in relation to the management of Northwest, or in relation to the subject matter of this litigation.

As regards the *Bankers Holding Corp.* case, *supra,* we deem it not controlling, inasmuch as (1) neither of the foreign corporations appears to have been organized for the particular purpose of acquiring controlling interests in concerns such as Northwest, and (2) Rem. Rev. Stat., § 3810, on which that case was founded, and under which Harbison-Walker and General might at one time have been considered as doing business within this state because they owned the capital stock of Northwest, has been expressly repealed. Laws of 1939, chapter 143, p. 438, § 19 (Rem. Rev. Stat. (Sup.), § 3803-62a [P.P.C. § 441-27]). Under chapter 185, Laws of 1933, p. 779, § 12 (Rem. Rev. Stat. (Sup.), § 3803-12 [P.P.C. § 441-21]), a corporation is permitted to acquire and hold shares of stock of any other corporation.

█ Under our view of the law, determined by the facts in this case, Harbison-Walker and General were not doing business in this state, and proper service of process was not made upon them.

█ However, we do not agree with the trial court that the order dismissing those respondents should be *with prejudice* to the state's cause of action against them. The court having been without jurisdiction over those parties, by reason of lack of proper service upon them or of general appearance by them, it had no power to pass upon the merits of the state's case as against those parties.

It now remains only for us to summarize our conclusions. The first of appellant's assignments of error, relating to the

controlling effect of the original Allen contract and lease, is well taken; liability of the respondent Northwest is properly predicated upon the terms of its written contract, and Northwest is not entitled thereunder to deduct from gross revenues the costs of exploration, development, and quarrying, but is entitled to deduct costs of cobbing and sorting; nor may it deduct from such gross revenues incidental expense prorated to those activities (other than cobbing and sorting) in the Stickney report. Also, the fifth assignment of error, relating to the character of the order dismissing the two foreign corporations, is decided in favor of the appellant; the decree of the trial court dismissing the respondents Harbison-Walker and General should be . confined to quashing of service of process as against . them, *without prejudice* to the right of the state to seek recovery from them in subsequent proceedings properly brought. .

Accordingly, the judgment, or decree, is reversed, and the cause will be remanded with direction to the trial court to conduct a further hearing to determine the additional sum due the state from Northwest, under the terms of this opinion, and thereupon enter a judgment or decree in accordance therewith. None of the parties will recover costs on the appeal.

MALLERY, C. J., JEFFERS, SCHWELLENBACH, ABEL, and HILL, JJ., concur.

SIMPSON, J. (dissenting)—This case has occupied the attention of the court for a considerable length of time. The first argument was to a department on June 12, 1945. An opinion was written by Judge Mallery reversing the trial court, granting the state an additional judgment in the sum of $113,291.05, together with accrued interest in the amount of $22,027.71. The opinion was signed by one judge other than the writer of the opinion. The cause was thereafter heard by the court sitting *En Banc* September 4, 1945. An opinion was written by Judge Mallery reversing the judgment of the trial court. Three judges other than the writer signed the opinion. I wrote a dissent upholding the judgment of the trial court. Three judges signed my opinion.

One judge left the bench, and the cause was reargued January 8, 1946. An opinion was written by Judge Driver allowing the state $133,817.25. Three judges signed that opinion. I again dissented upon the ground that the judgment of the trial court was correct. Four judges signed my dissent. The case was then assigned to me, and I wrote a majority opinion upon the same theory contained in my dissents. Two judges signed my opinion, and four judges signed a dissent written by Judge Beals, his theory being the same as that advanced by Judge Driver. The case was then assigned to Judge Beals, who wrote a majority opinion upon the identical opinion advanced by Judge Driver. Before anything further was accomplished, Judge Beals left the bench temporarily, and the case was argued again on January 30, 1947. At the last hearing, the cause was assigned to Judge Steinert, who has written the opinion to which this dissent is directed. Several of the judges have changed their minds about this case on different occasions, and three members of this court have not seen any of the prior opinions.

I write this dissent prior to the circulation of the majority opinion among the judges. I write it with the sincere hope that I may change the views of the present majority. I desire to change their minds because of my intense feeling that the judgment of the trial court was correct, and its judgment should be affirmed.

I base my dissent upon the following grounds:

First, the operations at the Moss claim were not that of mining but of quarrying.

Second, the state, by its agreements and conduct, was estopped to maintain this action to recover additional sums from respondent.

Third, the state land commissioner had the implied power to enter into the agreement relative to charges for transportation and treatment.

Fourth, this court is bound by the uncontradicted evidence in this case to affirm the judgment of the trial court.

The record discloses that the trial court was entirely familiar with the various phases of mining and quarrying, and made a careful inspection of the quarries, the mills, and

the reduction plant. The learned judge's memorandum opinion, upon which the judgment was based, reads in part as follows:

"This is an unusual case. Though it might be more satisfactory to the parties to enter judgment giving no reasons therefor leaving the parties wholly untrammeled in presentation of their theories to the Court required to give reasons for its judgments, that method might be taken to indicate want of study and attention, therefore, some of the reasons for the action of this Court will be indicated herein.

"Testimony in the case was heard beginning July 12th, 1943. For reasons apparently sufficient, plaintiff's opening brief was filed January 10, 1944, defendants' answer brief was filed February 4, 1944, and plaintiff's reply brief was filed February 28th, 1944.

"Brief visit to the plant and works of defendant after adjournment, brought to view an extensive enterprise consisting in part of the burning plant near Chewelah, Washington; miles of cable tramway leading to the quarries, extensive quarries, rock crushing equipment, flotation mill and a new and expensive construction designed to do much of the work formerly called mucking and sorting. These works are shown only in part by the exhibits and required an investment of several million dollars of capital. The defendant, Northwest Magnesite Company, besides its operations in this State, also owns and operates a plant in New Jersey at which it manufactures magnesite from dolomite and sea water. This plant has a capacity of 3000 tons per month. The Chewelah works have a capacity of 15000 tons per month. The 'Moss' claim, belonging to the State and involved in this action, is only a small part or side issue in the whole enterprise from which the State has been paid beginning January 23, 1932, approximately $71,000.00 as royalty. The Court will find from the evidence that the State would have received no income from this property after September, 1934, had it and defendant not agreed, acting through the State Land Commissioner, to the method of operation and reports followed and accepted by the State since that date.

"This court will find and treat this operation as a manufacturing, as distinguished from a strictly mining, enterprise.

"Regardless of the letter of the Statute, the fact is and men of experience know, that at the time of the enactment of the law, 1917, under which the contract is made (the

form of contract is set forth in the Statute), the kind of operation here involved was neither known of nor contemplated by the law making body.

"THERE IS NO MINING HERE, IN THE SENSE THAT TERM IS USED IN THE STATUTE, THIS OPERATION IS AN OPEN QUARRY, AN EXCAVATION, MORE LIKE THE OPERATION OF A CLAY PIT THAN A MINING ENTERPRISE. [Emphasis mine.] In the operation of a clay pit for manufacture of terra cotta, china ware or pottery, blasting, diamond drilling and sorting and cobbing would be a part of the operation and treatment . . .

"We agree with plaintiff that magnesite is a mineral, so is clay or any common stone; that is, it is not a vegetable substance, but magnesite in its raw state is a non-metallic substance as distinguished from metallic ores. The Statute was enacted to deal with metalliferous mining, metallic ores and minerals. The Statute is plain, 'other valuable minerals,' clays and common rocks that are quarried are not generally classed as 'valuable minerals.'

"We also agree with plaintiff that Sec. 1, Chapter 148, Laws of 1917 (R. R. S. Sec. 8018), authorizes the State Land Commissioner to lease the land involved for extraction of valuable minerals, other than coal, gold, silver, copper, lead and cinnabar, and prescribes the form of contract to be used by him and the Statute by common construction has been applied to this character of land.

"Also it must be conceded that the provisions of R. R. S. Sec. 8025 applies, to-wit:

" 'The terms and conditions on which the land covered by the contract . . . and the royalties paid, shall be agreed upon by the Commissioner . . . and the contract holder: Provided that the contract . . . shall provide for payment to the State of a royalty of not less than one per cent (1%) and not more than four per cent (4%) of all moneys received from the sale of minerals from said lands . . . after deducting therefrom the costs of transportation and treatment.'

"The royalty between 1% and 4% is left to the discretion of the Commissioner.

"Both the law under which the contract is made, and the contract itself, as applied to the conditions involved, are ambiguous and therefore open to construction by the parties and the Courts. The State Land Department always treated the contract as not adapted to the kind of operation covered by it . . .

"By the terms of the Statute, the State Land Commissioner, acting for the State, and the lessee are to make an agreement in the first instance. Having authority to make an agreement in the first instance includes authority to alter, change or modify the contract, if in his judgment altered conditions require a change and to the Commissioner is left the determination of what is transportation and what is treatment. This must be determined by him before he can decide what deductions are to be made therefor. Having authority to make and being required to make this determination, includes the responsibility of being mistaken in his conclusions and judgment and binds the State thereby. *Strand vs. State*, 16 W. 2-103.

"Treatment is not defined by the Statute or contract. The terms may be used in a broad or limited sense. Had this been a coal or clay pit operation, blasting, sorting out waste and cobbing would, without question, all be considered as treatment, and the cleaned or treated output would pay royalty on a ton basis. While treatment does imply something more than blasting, selecting and sorting, it may also include these operations.

"The difficulties of the operation were presented to State Land Commissioner Martin in the spring of 1934. The defendant was ready to abandon the contract unless some definite agreement could be reached as to its practical construction and methods of operation. The Land Commissioner then knew that the product of this quarry (Moss) was of so low a grade that it could only be operated at a profit when the product of the Moss was blended with higher grade magnesite taken from other quarries of the defendant. In other words, the Moss by itself, was commercially worthless to the State. If the contract was abandoned by the defendant, the State would receive no royalty whatever from it. The Land Commissioner was then advised that to put the quarry (Moss) in condition for commercial and practical operation, the defendant must spend $154,000.00 for dead work, stripping ten to forty feet of over-burden on the Moss and removing it. Removal of this over-burden cost $220,000.00 instead of $154,000.00 as estimated in 1934. Ex-State Land Commissioner Martin is not a witness in the case, but he seemed to think he had done a good job for the State. (St. 286-289)

"According to the testimony of witness Garber, the Land Commissioner agreed to a deduction as treatment and transportation of all costs of production, including quarrying and reduction. (St. 284-6) and including removal of over-

burden. This testimony is uncontradicted, and is corroborated by letters of the Commissioner, and the conduct of his department. (St. 287) (St. 284-279). This litigation arises after an election brings a new head to the department.

"THAT THIS OPERATION COULD NOT HAVE BEEN CONDUCTED BY THE DEFENDANT OR ANYONE ELSE, COMMERCIALLY, WITHOUT INCLUDING SO-CALLED 'MUCKING' AS A PART OF TREATMENT IS SHOWN BY THE FACT THAT DEFENDANTS' COST OF SO-CALLED 'MUCKING' BETWEEN JANUARY 1, 1932, AND DECEMBER 31, 1942, WAS $1,037,957.13. [Emphasis mine.]

"Under the construction placed upon the contract by the State Land Commissioner Martin and the defendant and under the agreement, the Court finds they made as to operation of the property, and deduction of costs of production, including quarrying, reduction, removal of over-burden and transportation and method of reporting royalty, more than the minimum royalty the statute authorized the Land Commissioner to agree defendant should pay, has been paid. Relying upon the agreement, the defendant has expended large sums of money (more than $200,000.00) to make the State's property commercially operative, and pursuant to the agreement the State has received more than $70,000.00 and cannot receive and accept the benefit of its bargain and then come into court and repudiate the contract.

"The court finds that the defense of defendant, Northwest Magnesite Company, mutual construction of the contract is sustained, and that the State is now estopped to claim any sums except in accordance with the understanding between Martin and defendant . . .

"The audit and report made by witness Stickney, under the evidence cannot be made a basis for an accounting, but the accounting must be based upon the agreement and arrangement made in 1934 between the State Land Commissioner and the defendant Northwest Magnesite Company.

"Under that agreement the defendant is entitled to deduct all quarry costs including so-called mining, stripping over-burden, mucking, cogging and crushing and milling and transportation costs, including administration and management costs, social security costs, and insurance and taxes paid on account of operation of the State's property;
. . .

"As to insurance, only the insurance, unemployment insurance, old age pensions, state industrial insurance and group life insurance paid on account of the State's property should be deducted."

I shall refer to Northwest Magnesite Company as Northwest.

Magnesite is a mineral of primary importance as a refractory material for lining steel furnaces, although substantial amounts are used in the production of flooring compositions and other building materials, and for certain chemicals.

The principal desposits of magnesite in the United States are in the states of Washington, California, and Nevada. However, the Nevada quarries have not furnished any commercial production. The Washington deposits are in Stevens county, near Valley and Chewelah. The magnesite occurs massive in large deposits of two hundred or more feet thick and one thousand or more feet long. They were sedimentary, originally, and evidently formed by the replacement of dolomite lens. The material ranges from fine grain to coarse, and is gray, white, black, pink, or red in color.

The production of magnesite in Washington was begun in December, 1916, by the Washington Magnesite Company, which in the following year became the Northwest Magnesite Company. The Northwest Magnesite Company is now the only operator. The principal holdings of the company are the Allen, Finch, Red Marble, and Keystone deposits. Early in 1917, the American Mineral Production Company acquired three mines west of Valley, Washington, and after carrying on a development project, shipped considerable quantities of crude and calcined material during the first year. Much of the output of this company was from the Allen quarry, situated seven miles northeast of Valley. The Allen quarry and the Moss quarry were operated at the north and south ends, respectively, of the magnesite lens, about a quarter of a mile long. The method, or operation, of quarrying is shown by the following pictures introduced in evidence during the trial.

1940. Finch, looking north.

Allen quarry in foreground.
Finch quarry in the distance.

1943: Moss quarry looking south from Finch.

The securing of magnesite, like that of other minerals, is governed by local conditions. At the Moss quarry, after the overburden had been removed, the operators put in a drift, or tunnel, under the entire deposit, and from that tunnel drove shafts, or openings, to get to the upper levels. The reason for driving the vertical oreways through the entire deposit was to enable them to start at the top and work down. The quarries are worked exactly like stair steps—forty feet are taken out, then another step, and so on, until the top is reached. Then the magnesite is dumped down and eventually goes through the crushers into the plant.

The Moss quarry, to which I have just referred, is the property leased from the state. The magnesite from that quarry has nine per cent silica and four per cent lime. A vast amount of work is necessary to prepare magnesite for the market. First, the operators must ascertain by the use of diamond drills the location of the magnesite. Having found it, they must uncover it. This is done by a method called stripping. Stripping is the taking from the quarries the overburden of trees, earth, rocks, and other materials, including deposits of dolomite or greenstone. On some portions of the Moss property the overburden exceeded in quantity the magnesite itself.

The contract between the state and Raymond Allen, which was finally assigned to respondent, provided

" . . . that the party of the second part shall pay to the party of the first part, on the first day of each calendar month for the full term of this lease, a royalty, the amount of which shall be equivalent to four per cent (4%) of all moneys received from the sale of all minerals from said lands covered by this contract and lease after deducting therefrom the cost of transportation and treatment."

Mr. Earl Garber, of Chewelah, vice-president and general manager of Northwest, had been connected with that company since 1933. After describing the method of stripping, he testified as follows:

"After that is done we have to be able to get that rock down off the mountain, and usually at your level where you

are going to use the rock you put a drift or tunnel under your entire deposit, and from that tunnel you drive shafts or openings where you can get at the upper level. When you get that done it is necessary to blast the rock down off the cliff. THE COURT: You work that by a coring system from below instead of quarrying from above? I want to know how that is. A. I want to correct that, please. The only reason we drive these vertical oreways from a tunnel through the entire deposit is to be able to start at the top and work down, and then we work our quarries exactly like a stair step; take out forty feet, roughly, and then another step, and so on till we get to the top. Of course there is blasting, and we dump the magnesite down and run it through the crushers and to the plant. THE COURT: *It is open quarrying, is it?* A. *It is open quarrying.* MR. SPILLER: So I can follow you, do I understand this magnesite is on a mountain, or in a mountain, rather? A. Yes sir, it is. Q. How do you get at the magnesite itself from below, tunneling into the mountain or from the face of the mountain? A. From the face of the mountain. We tunnel in below in order to be able to haul it, in order to get the rock off the mountain and then out to the plant. We make a hole through the entire mountain and then start at the top and work down. Q. You do that, I take it, for the reason it is actually cheaper, a little cheaper for you to bring it out with that system, rather than quarrying it at the top and carrying it down the mountain, that correct? A. Well, it would be almost impossible to do that any other way. Q. It would? A. Yes sir. Q. Now, go ahead. A. Well, after we have this preliminary stripping, and your tunnels, and your levels lined out, why, it is necessary to shoot that down, blast it down, and after it is blasted down, the magnesite doesn't lie pure, I mean it is mixed with different kinds of materials, and after it is blasted down it has to be again blasted in order to get it down to man's size—where men can handle it, and then it is hand picked by muckers—the waste thrown in one pile and the good ore in another pile. And after it is sorted the sorted ore is transported to one of these vertical oreways. Q. One of these what? A. One of these ore chutes that go up through the mountain. . . .

"A. At the bottom of these vertical oreways it is loaded into a car and transported to a crusher, and through a series of crushers, onto an aerial tram, and then down to the plant, where it is burned in rotary kilns. MR. SPILLER: Q. Now, how far is the plant from the mine? A. About six miles. Q. About six miles? A. Yes sir. Q. And how far is

it from the bottom of the vertical oreway—is that the correct term? A. Yes. Q. To your first crusher? A. To the first crusher? It is about a quarter of a mile. Q. Yes? A. And then from that crusher it goes to another, about a mile."

The cost of stripping was in excess of $200,000, and the cost of mucking was $1,370,957.13. Respondents contend that the process of securing the ore is not mining, but quarrying. The trial judge had this definitely in mind when he stated: "I am going to determine what is mining and what is not."

In speaking of the statute, Rem. Rev. Stat., § 8025, and the operations of Northwest, the trial judge stated:

"When the Legislature passed this statute, spoke about mining, contracts for mining, has it ever been held that they meant quarrying? Has it ever been held that they intended to include drag line operations as mining operations? Don't think such a thing was known at that time. Don't think we ever heard of a drag line mining operation at that time. There wasn't any. They don't say anything about quarrying. This is merely a quarry. Now, when it comes to the handling of this rock, I am wondering again what is 'treatment.' What is 'treatment?' It was, I assume, like blasting a way for a railroad grade. Put some big holes down in that rock, did you, and filled it with black powder, shoot off a big blast, loosen tons and tons of it. I am just assuming that if you were experienced operators that's the way you started mining. So that it wasn't mining."

C. A. Sargent was the only mining expert who testified in this case. Mr. Sargent graduated from the University of Idaho School of Mines in 1923 with a degree of mining engineer. After graduation, he was engaged in mining and was for some time in charge of mining operations in the Coeur d'Alene district. In November, 1926, he became associated with Northwest and since 1933 has been its superintendent in charge of quarries. Mr. Sargent testified that, from a mining engineer's viewpoint and in accordance with general mining rules, the operations at the site of the magnesite deposits were quarrying and not mining, and that the work done there was treatment; that the work consisted principally of mucking. He defined mucking, in so far as it related to the operation at the quarries, as sorting the ore

after it had been broken into small pieces by hand with a hammer; that mucking embodied the blending, sorting, and mixing the proper proportions so that a specific product could be manufactured. A mucker at the quarry was an ore sorter; he "would be called an ore sorter as we apply it here. That's correct. He is doing a distinct job, as I would say, treating the rock, making the separation."

In comparing the method of mining gold and silver with magnesite, Mr. Sargent stated:

"No comparison with gold and silver. With magnesite— with gold and silver you have an entirely different proposition than magnesite. You are concerned with the finished product right from the onset. You remove that from the earth and you get a cash value for it immediately; whereas magnesite has to be put through a process, a manufacturing process, before it has any monetary value."

The United States bureau of mines, in its information circular of December, 1943, spoke of the mining in Stevens county, Washington and stated:

"The magnesite is quarried from three large open pits and sent by aerial tramways down the hillside to crushing and calcining units on a rail spur. Quarrying methods also are used to recover magnesite and brucite in Nevada. In California, magnesite generally occurs in veins and is won by underground mining. Dolomite is usually recovered by quarrying. The overburden is removed, the dolomite is broken out by blasting, loaded by power shovels into trucks or quarry cars, and hauled to the surface for washing and crushing."

Every witness who knew anything about mining was of the opinion that the work at the quarry was treatment. In fact, the only opposition was voiced by Mr. C. L. Stickney, an accountant who worked for the land commissioner and audited the books of Northwest. Mr. Stickney was not a mining man. He did not claim to know anything about mining. He just "assumed from the books" that the work at the mine was not treatment. Appellants contention is built, *not upon the evidence introduced at the trial, but upon the mere theory of its accountant.*

Appellant's counsel constantly referred to the "magnesite mines" in order to emphasize the word "mining," as used in the contract. The place from which the magnesite was taken was entirely over and above the level of the surrounding grounds. This is clearly indicated by the pictures which we have made a part of this opinion. Places of that nature have been held to be quarries. *Murray v. Allred,* 100 Tenn. 100, 43 S. W. 355, 66 Am. St. 736, 39 L. R. A. 249.

It being established that the operations on the state's property were quarrying, it must be held that the rules contended for by appellant relative to mining do not apply.

It now becomes necessary to determine the meaning of the words "transportation" and "treatment" mentioned in the statute. The meaning of the words, they not having been defined by the legislature, do not admit of statutory construction, but must be shown by evidence. That knowledge must be obtained from the evidence of men learned in the profession or business of mining and quarrying. Judges are not chemists, scientists, geologists, or botanists. They are not experts in the field of lumbering, agriculture, mining, electricity, or any of numerous activities of life in which men and women devote their entire time to the study of one enterprise. Judges devote their entire life study to applying the principles of law to factual situations, and to the interpretation of statutes. The courts of the United States are unanimous in holding that the information relative to the meaning of undefined words in a statute must be obtained from experts in the business or work under consideration. Technical words, or terms of art relating to trade, when used in the statute dealing with the subject matter of such trade, are to be taken in their technical sense. 2 Sutherland, Statutory Construction (3d ed.) 437, § 4919; 50 Am. Jur. 438, § 413.

Following we call attention to a large number of cases that uphold the statements just made:

The first and leading case upon this subject is Two Hundred Chests of Tea, 22 U. S. 428, 6 L. Ed. 128. That case involved tea imported from China as bohea tea. The customs collector claimed that the tea was not bohea, but

souchong, or black, and called for a higher tariff rate than bohea. In deciding this question, the United States supreme court looked to the record and ascertained the definition of the term as used in the tea trade from the testimony of witnesses. It held that the object of the duty laws was to raise revenue, and for that purpose classed substances according to the general usage and known denominations of trade.

The above case was followed by the *United States v. One Hundred & Twelve Casks of Sugar*, 33 U. S. 277, 8 L. Ed. 944. The court held that all laws relating to the payment of duties are for practical application to commercial operations, and are to be understood in a commercial sense. The conclusion of the court was reached by a consideration of the evidence of merchants, sugar refiners and chemists. It was stated by the court:

"The decision in this case turns entirely upon the question, whether, in point of fact, the merchandise was different from the denomination under which it was entered; that is, whether the article was sugar, and not syrup; and if not syrup, then whether such entry was made with intent to defraud the revenue. It is deemed unnecessary to go into a particular and detailed examination of the testimony on the trial. A number of witnesses were examined on both sides, for the purpose of ascertaining the character and denomination of the article in question. It was a pure question of fact, and the nature of the inquiry admitted of nothing more certain than an expression of opinion, and which resulted, as is generally the case in such inquiries, in a difference of opinion. In such cases, the court must be governed, in a great measure, by the character and intelligence of the witnesses, and the opportunities they have had of becoming acquainted with the subject upon which they are called upon to express an opinion; and the weight of the opinion of a witness, and the influence it is to have upon the tribunal, whether court or jury, which is to decide upon it, will depend very much upon seeing and hearing the witness give his testimony. When, therefore, a case rests upon a mere question of fact, and especially, when that fact is to be ascertained by the uncertain evidence of opinion, the appellate court ought to place much reliance upon the decision of the court below, and not reverse a decree, unless

it is very satisfactorily shown to be against the weight of evidence."

*Tyng v. Grinnell,* 92 U. S. 467, 23 L. Ed. 733. That case called in question the amount of duty to be paid on wrought iron in tubular form. The collector attempted to levy a tariff tax of three and one-half cents a pound as for wrought iron tubes. The question which was decided was the meaning of the tariff act which imposes the duty upon "steam, gas and water tubes and flues." In passing upon the issue presented, the court said:

"Whether the articles are wrought-iron tubes, as insisted by the United States, or are wrought-iron flues, as contended by the plaintiffs, was certainly a question of fact dependent upon the evidence."

In *Arthur v. Lahey,* 96 U. S. 112, 24 L. Ed. 766, it was held that the commercial designation of an article among traders and importers, when clearly established, fixes its character for the purpose of the tariff laws.

Based upon evidence, the supreme court of the United States, in *Worthington v. Abbott,* 124 U. S. 434, 31 L. Ed. 494, 8 S. Ct. 562, held that nail rods consisting of straight, flat pieces, about an inch in width, and three-eighths of an inch in thickness, were not bar iron within the meaning of the tariff law which taxed "all other descriptions of rolled or hammered iron not otherwise provided for."

*Arthur's Executors v. Butterfield,* 125 U. S. 70, 31 L. Ed. 643, 8 S. Ct. 714, holds that a designation of an article of commerce by merchants and importers, when clearly established, determines the construction of a revenue law when that article is mentioned.

In *Nix v. Hedden,* 149 U. S. 304, 37 L. Ed. 745, 13 S. Ct. 881, the question presented was whether tomatoes were to be classed as fruit or vegetables under the tariff act. The court found no particular help from the witnesses called, and decided the point through the use of a dictionary, which was not evidence, but an aid to memory and understanding.

*Sonn v. Magone,* 159 U. S. 417, 40 L. Ed. 203, 16 S. Ct. 67. It is of peculiar interest in the above case that the United

States supreme court determined that the trial court committed error in refusing to allow the admission of certain evidence in order to explain the meaning of the terms used in the statute. It was also held that the trial court erred in advising the jury that:

" 'The commercial designation of the article, or what the article is called in trade and commerce, or the name bean, has nothing to do with the question.' "

Accord: *Nix v. Hedden,* 149 U. S. 304, 37 L. Ed. 745; *Lutz v. Magone,* 153 U. S. 105, 38 L. Ed. 651, 14 S. Ct. 777; *Maddock v. Magone,* 152 U. S. 368, 38 L. Ed. 482, 14 S. Ct. 588; *United States v. Stone & Downer Co.,* 274 U. S. 225, 71 L. Ed. 1013, 47 S. Ct. 616.

*Kennedy v. Hartranft,* 9 Fed. 18. The question was whether "cotton ties" were dutiable as hoop iron under the tariff laws. In charging the jury, the court required that they determine from the evidence whether or not there was a general restrictive meaning of the term in the trade, and if so, what that meaning was.

*Ross v. Fuller,* 17 Fed. 224. Plaintiff had paid duty, under protest, for the importation of "iron forgings for axles" at the rate prescribed for "axles." To determine the type of product in question the court charged the jury, in part, as follows:

"The question for you to determine from the evidence is, to which of these classes of importations the articles imported by the plaintiff belong. Were they axles within the meaning of the law, or were they only bars of 'hammered iron?' This is a question of fact that you must settle from the evidence you have heard on the trial of this case. Much of the evidence consists of that of experts engaged in making and trading in iron and manufactures of iron in various forms. This evidence is to be considered by you. Its weight and reliability always depend very much on the capacity and knowledge of the witness as an expert,—his experience and means of enabling him to form opinions upon the subject about which he may testify."

In *Abbott v. Worthington,* 20 Fed. 495, there was a question as to whether the items imported were to be classified "bar iron" for the purpose of assessing duty. The court

decided, from the evidence of commercial usage, that the products were "nail-rods," and therefore subject to a lower tariff.

The action in *McCoy v. Hedden,* 38 Fed. 89, was to recover duties alleged to have been exacted in excess of the lawful rate applicable under the tariff act to curry-combs imported by the plaintiff. In its charge to the jury, the court instructed that it was for them to determine whether the articles were included in the statute. It was said:

"We probably all supposed that we knew what a comb was until we heard the evidence in this case. It is in the light of that evidence, however, that the question must be decided by you."

*Fox v. Cadwalader,* 42 Fed. 209, was an action brought by an importer to recover an alleged excess of duty imposed by the collector. The jury was charged with determining whether or not the items were dutiable as "philosophical apparatus and instruments." The evidence submitted was that of various witnesses familiar with the trade.

*In re Herrman,* 52 Fed. 941, was a case in which application was made by the importer for review of the decision of the board of United States general appraisers concerning the classification of "astrachans." The court considered the testimony of the witnesses as controlling, and stated:

"There is the well-known rule, reiterated over and over again, that, if words have a special meaning in trade and commerce, they are to be given that special meaning when we find them in tariff statutes."

*United States v. Wotton,* (C.C.A. 1st) 53 Fed. 344, was an appeal from the board of United States general appraisers upon the question of the classification of "plucked coney skins" under the tariff act. The court held, "upon all the evidence," that the board was correct in admitting them duty free, since they were not "dressed" in the contemplation of the custom of the trade, and ". . . the terms of tariff laws are to be construed in accordance with commercial usage and understanding."

In *"Zante Currants,"* 73 Fed. 183, the question presented was whether the currants imported should be admitted duty

free because they were not Zante currants which were taxed under the tariff act. The court carefully considered the testimony of the expert witnesses in deciding that the articles were Zante currants.

*Carter v. Liquid Carbonic Pac. Corp.*, (C.C.A. 9th) 97 F. (2d) 1, was an action against the estate of the collector of internal revenue to recover excise taxes paid upon carbonic acid gas manufactured and sold by the claimant. The question was whether the sale of carbonic gas to a brewer of 3.2 beer was a sale to a manufacturer of carbonated beverage and therefore taxable under the revenue act. With respect to the evidence, the court said:

"At the trial the appellee produced five witnesses, all of whom were qualified as experienced either in the manufacture of beer or of soft drinks. These witnesses testified that the word 'beer' has a definite meaning in the beverage trade as does the term 'carbonated beverages'; that the term 'carbonated beverages' in trade usage does not include 'beer.' No evidence contradictory to that just summarized was introduced.

"Since we are dealing with a tax which is directed at a particular industry, this definite proof of a trade usage as to the term 'carbonated beverages' calls into application the familiar rule that commercial and trade terms having a uniform and definite meaning in commerce and trade will be interpreted accordingly."

This statement of the rule was quoted with approval in *Fleming v. Hawkeye Pearl Button Co.*, (C.C.A. 8th) 113 F. (2d) 52, where the meaning of the term "processing" within the provision of the fair labor standards act was before the court.

*Massachusetts Protective Ass'n v. United States*, (C.C.A. 1st) 114 F. (2d) 304. This case was concerned with the definition of "unearned premiums" under an income tax statute. The court said:

"And where the applicable section deals with a particular trade or business, as insurance, the technical insurance terms must be considered to be used in the sense in which such terms are generally used or understood in the insurance business. . . .

"The uncontradicted oral testimony in this case shows that in the insurance business the term 'unearned premiums' includes . . ."

*General Petroleum Corp. of California v. United States,* 24 F. Supp. 285, was an action to recover a tax paid on casing-head gasoline under a statute which provided for assessment on the transportation of crude petroleum and liquid products thereof by pipe line. The court stated that the words were to be interpreted in the sense in which they were understood by those in the trade, and then carefully examined the testimony of the expert witnesses called by both parties. However, since there was such a divergence of opinion of the experts, the court decided the case largely upon the legislative history of the enactment.

*Standard Oil Co. of California v. United States,* 39 F. Supp. 180. This was an action similar to the *General Petroleum Corp. of California v. United States, supra,* with the exception that the tax had been assessed on transportation of natural gasoline. The *General Petroleum* case was discussed at length, the court, however, saying:

"A summary of the evidence before the Court establishes the fact that natural gasoline, which is derived from wet natural gas, is a product of petroleum as it has been defined by the Commissioner . . . as it is understood by scientists, and as it has been established by experts in this case."

*In re Herman,* (on appeal) (C.C.A. 2nd) 56 Fed. 477. The court reviewed the testimony of the expert witnesses and, in affirming the judgment of the lower court, said:

"It is hardly necessary to reiterate the well-established rule of statutory construction which declares that the commercial designation is the first and most controlling standard for the classification of dutiable subjects in tariff laws, and that commonly it is only when the commercial designation fails to give an article its proper place in the classification of the laws that resort is to be had to the lexicographers or other sources of interpretation."

*United States v. Semmer,* 41 Fed. 324, was an action to recover a balance of unpaid duties, the question being the classification of glass which was imported. In the charge

to the jury the court required them to determine what was "ground glass" under the tariff act, and said:

"Of course, the tariff laws deal with the commerce of the country; and in interpreting them we continually revert to the usages of trade and commerce, and constantly have upon the stand commercial men to enlighten us as to that trade and commerce."

*In Wieland v. Collector of Port of San Francisco,* (C.C.A. 9th) 104 Fed. 541, it was held that the evidence of the expert witnesses supported the judgment of the lower court in the definition and classification of "sprats in oil" under the tariff act.

*Katzman v. Commonwealth,* 140 Ky. 124, 130 S. W. 990, 30 L. R. A. (N.S.) 519. In a prosecution under a penal statute for the unlawful sale of drugs, the commonwealth submitted the testimony of expert witnesses to determine what constituted "legitimate purposes" under the statute. In holding the testimony admissible, the court said:

"The statute was intended to regulate sales by druggists, *and when it is sought to apply the words 'legitimate purposes' to a sale of drugs or poisons by druggists, they have a technical meaning that may not be clearly known or understood by courts or jurors, and so it is permissible to allow experts to give evidence as to what is regarded by qualified druggists and physicians legitimate purposes for which sales may be made so that the trial court and jury may be informed as to what is recognized as a legitimate purpose for which these drugs may be sold by those entrusted with their sale, and to whom, in a measure, is confined the knowledge as to what constitutes a sale for legitimate purposes.* When words are used in a penal statute that have both a popular and a trade or technical meaning, and as used in the statute they have reference to a trade or profession, these words in construing the statute should be given their meaning as understood by the trade or profession to which they apply." (Italics mine.)

In *Iowa Coal Washing Co. v. Consolidated Coal Co.,* 210 N. W. (Iowa) 440, the parties entered into a ten-year contract whereby defendant agreed to sell to plaintiff all "screenings" and nut coal which it produced, there being specified the size of each type. After several years defendant

ceased to "screen" its coal, and contends that it is therefore no longer producing any, and is under no obligation to plaintiff. In the operations at the mine the screening process was accomplished prior to loading the coal on railroad cars. The court decided that the "screenings" and nut coal were produced on the "shot" or blasting in the mine, and that the act of separating by screening merely determined the quantity of each type. The court stated that

" . . . in the literature of the mine, screening is an act of segregating or separating, and not of producing."

The "producing" referred to in the quotation is used with respect to the operation of the miner, since by statute he is paid for the screenings as part of his production. As long as the defendant continued to mine, he produced some nut coal and screenings. The plaintiff, therefore, was entitled, under the contract, to the questioned type of coal immediately upon its being separated when the coal ore was blasted.

*Iowa Coal Washing Co. v. Consolidated Coal Co., supra,* was returned to the court on another appeal, 204 Iowa 202, 215 N. W. 229, but was concerned largely with pleading, and did not offer further definition.

In a state of Washington decision, *Smith v. Hecla Mining Co.,* 38 Wash. 454, 80 Pac. 779, a "mucker" was described as one who "removes the ore, rock and debris thrown down by the miners in blasting." In the mine the production was lead and quartz, however, and there was no question raised of the "treatment" of the ore.

Applying the universal rule relative to statutory interpretation to the undisputed facts as disclosed by the evidence, we can come to but one conclusion, and that is that the trial court was correct in holding that the work done under the agreement with Mr. Martin was "treatment" and "transportation." The evidence came from men of unquestioned honesty, ability, and experience. Mr. Garber testified that the separation of the magnesite could not be classed as anything other than treatment. Mr. Sargent

stated that the manner in which they had to blast the quarry deposits is considered a type of treatment. The witness also testified:

"Q. Mr. Sargent, in mining gold, silver, copper, is there much question of what constitutes treatment of those particular ores? A. No, there never is, goes direct to the smelter, silver and gold as well as other metals, and all contracts are made directly, on a royalty basis, with the smelter being the third party. Q. Now, coming down to this Moss quarry —the operation you have got there—is it possible, or are you able as a mining man to define what constitutes treatment of this product and the manufacture of it. A. Well, I don't know whether I can give you the exact legal term that will stand up in the Supreme Court, other than the broad statement of treatment. That treatment is that process by which a mineral or ore is placed in proper chemical and physical condition to be of marketable value. Q. Is there any similarity between the treatment of magnesite manufacture of magnesite and gold and silver and copper? A. Any similarity? Q. Yes. A. No, there is none excepting in a very broad sense you do—. No, I can't see where there really is. You are dealing with a non-metallic substance that has to be treated right from the onset to have any value, whereas in gold and silver you have the material right in its native final condition, has not been grouped with any other such things as carbonate. One element, gold. Occasionally you have a combination of some silver with it, but the point is—it is just a very simple problem to separate the gold from silver. Ordinarily you don't have to wait to get your money from the smelter, you can get it on the reputation of your district carrying a certain quality of gold."

## Estoppel

The majority opinion states that estoppel does not apply here, and gives the following reasons for so holding:

"(1) estoppel may not be asserted to enforce a promise which is contrary to statute and to the policy thereof; (2) estoppel may not be asserted to enforce the promise of one who had no authority to enter into that undertaking on behalf of the state; and (3) the evidence does not present such a case of injustice as requires application of the doctrine of estoppel."

I maintain that there was nothing illegal in the contract or agreement made by Northwest and the state land com-

missioner, nor was it in any way contrary to public policy. There is nothing contained in the oral agreement which violated the statute. The agreement simply construed the meaning of "treatment" and "transportation." There was nothing done contrary to public policy, as I shall demonstrate by the consideration of cases from practically all of the courts in the United States, including this court. I shall demonstrate further, from the cases, that estoppel may be predicated upon official acts, though there is nothing in the statute that definitely authorizes such acts. The facts show conclusively that to repudiate the oral agreement would result in manifest injustice to respondent, and that equity and justice demand the application of the doctrine of estoppel.

In order to make clear my position that the state, acting in its governmental capacity, was estopped to deny the contract as interpreted and agreed upon by the land commissioner and Northwest, I find it necessary to set out additional facts.

A serious problem was presented to the land commissioner and by those representing Northwest. Northwest owned five quarries in the vicinity of "Moss" and were undecided whether to use the Moss quarry or operate only those owned by Northwest. It was known then, and the state's witnesses admit the fact, that the magnesite in the Moss quarry was absolutely worthless, alone, for commercial purposes. Its lime and silica content was so high that it would not make brick for furnaces. The only way it could be used was to mix it with ore from quarries owned by Northwest. The following record bears out the statement just made.

Mr. Sargent testified that the Moss quarry, standing by itself, could not have been used commercially. He gave his reasons as follows:

"A. THE SUPPORTING EVIDENCE HERE OF ANALYSES SHOWS THAT THE LIME IN IT, AVERAGED FROM NUMEROUS SAMPLES, MILL RUN SAMPLES OF FIFTY TONS OR MORE, THAT ANALYSIS WAS 3.48 PER CENT. LIME CONTENT, WHICH IS BETTER THAN FIFTY PER CENT. TOO HIGH. Q. AT THIS POINT, MR. SARGENT,

IN ORDER THAT THE COURT MAY UNDERSTAND, IN MANUFACTUR-ING MAGNESITE WHAT IS THE FACT WITH REFERENCE TO MAG-NESITE HAVING TO BE A CERTAIN GRADE, OR QUALITY, OR SPECIFICATION—THAT'S THE WORD I MEANT. A. WELL, IF YOU HAVE AN EXCESSIVE AMOUNT OF IMPURITIES YOU HAVE A FAILURE TO WITHSTAND THE HOT TEMPERATURE, AND YOU GET IMPROPER PHYSICAL ACTION IN BRICK OR IN ANY LINING THAT YOU MIGHT PUT IN A KILN OR FURNACE. Q. NOW THEN, IN ORDER TO OVERCOME THAT DIFFICULTY WHICH YOU HAVE ENU-MERATED, WHAT WAS NECESSARY TO DO WITH THE ORES OF THIS MOSS QUARRY IN 1934 SO THAT YOU COULD OPERATE IT? A. IT WAS NECESSARY TO BORROW THE PROPER QUALITY OF MAG-NESITE FROM THE FINCH PROPERTY TO IMPROVE THE GRADE SUFFICIENTLY TO MAKE IT THE PROPER ANALYSIS. Q. I WILL ASK YOU AT THIS POINT, WHAT WAS THE RELATIVE CONTENT OF THE FINCH QUARRY WITH REFERENCE TO LIME CONTENT, AS COMPARED TO THE MOSS? A. IT WAS—THE RECORDS SHOW IT WAS APPROXIMATELY 100 PER CENT. LESS, OR HALF THE CONTENT OF THE MOSS, WHICH WOULD BE ONE AND THREE QUARTERS PER CENT. The Court: SO YOU BLEND THE FINCH AND THE MOSS TO BRING THE MOSS UP TO A GRADE THAT WAS COMMERCIALLY ACCEPTABLE, IS THAT THE IDEA? A. I HAD TO BORROW IT. IT WASN'T NECESSARY TO DO ANYTHING TO THE FINCH. THE OPERATING RECORDS SINCE 1917 INDICATE IT WASN'T NECESSARY. YES, THAT IS TRUE." (Emphasis mine.)

During the year 1934, Land Commissioner Martin sent W. L. Bell, a mining man, to the Moss claim. Mr. Bell made an examination of the property and the method of securing and treating the magnesite ore. In a report to the commissioner, Mr. Bell stated:

"The Company also states that the limits in analysis of crude magnesite are $SiO_2$ (silica) 3.25% and CaO (lime) 2.75% and that the Moss production, after sorting, has averaged silica 2.95% and lime 3.48%. In order to bring this material within permissible limits it is necessary to blend it with Finch ore of 1% lime content to the extent of about ⅓."

May 19, 1934, Land Commissioner Martin wrote Mr. Garber a letter, which contained the following statement:

"The ore you are mining from the Moss claim is not like other ores which have a standard value, such as gold, silver, lead and zinc. In other words, to take the ore itself from

the Moss claim and ship it to a smelter, there would be no return . . .

"No preparations have been made in the mining laws to take care of materials other than copper, lead, silver, gold and coal. Every other material is simply stated as valuable mineral, and the present law does not apply to some of the valuable materials. Such is the case in the Moss claim."

Mr. Bell and Mr. Sargent examined the property together before Northwest had started any serious development of the Moss quarry. In speaking of the conditions surrounding the Moss claim, Mr. Sargent stated:

"A. We were faced with a deposit that was entirely raw as nature had placed it, with the exception that the *American Mineral Production Company had operated in there possibly three years on the first floor, and had left it in worse condition than it had been had they not gone in there.* Their waste dumps were resting on ore. They had planned no diamond drilling program. They had done no stripping, and it was pocketed with various small working points. So there was no definite coordination or method in mining there at all. We were faced with that. *We were faced with an extreme shortage of water, which is necessary for some drilling and accommodation of the crew.* We were faced with no means of transporting the ore to our present crushing plant. We had no machine haulage facilities to move the ore to the crushing plant, and one of the bad conditions was—the general lay of the land was a very flat terrain surrounding the quarry where waste dumps had to be moved a great distance. I think that sums it up.

"Q. *I might ask you at this point, had your company, or you under their direction, at that time taken any steps toward possible development of your other two quarries, Keystone and Red Marble? A. Yes, we had.* Q. State what it was. A. I had already completed a proposed right-of-way for the aerial tram, and cleared this right-of-way of all heavy timber, about five miles in length, at very heavy cost because of the terrain. We had installed all poles and power line of high tension voltage—(Interrupted.) Q. Pardon me, just at this point, to which quarry are you referring. A. I beg pardon, the Keystone. THE COURT: That's the one off to the southwest? A. Yes. Q. Five miles? MR. RAFTIS: About five miles. A. And we had also installed some camp facilities there, and foundation for air com-

pressor. There also had been very considerable diamond drilling program completed there." (Italics mine.)

Mr. Garber testified, and his testimony was not challenged, that Mr. Martin in 1934 assured him that the method of calculating the royalty could continue. He testified further:

"*Mr. Garber, what development and improvement did you make on the Moss quarry relying upon the agreement with Mr. Martin, as you testified, that the method of calculating these royalties might continue from 1934 on, if any? A. After that assurance we received permission to go ahead and develop the Moss property instead of the Keystone, due to geographical location. We inaugurated a stripping program, power shovel, made necessary· contracts with men, haulage, increased tram facilities, had diamond drilling and our preliminary development work in order to get at the ore. And when I talked with Mr. Bell over our reports we estimated that cost to be about $154,000.00. As I remember the actual cost was some $220,000.00.*

"THE COURT: $220,000.00? A. *As I recall.* MR. RAFTIS: *Mr. Garber, would your company have undertaken and incurred this expense and these improvements had you not received assurance by Mr. Martin that the method of calculating royalties could remain as it was, when you discussed the matter with him in '34? A. Absolutely not.* My recommendation would have been to go ahead with the Keystone. Q. And in operating your own property I take it the matter of royalty would have been entirely eliminated? A. Yes sir, it would have been. Q. Don't believe it has been testified to—approximately how large are these Keystone and Red Marble properties, compared to Moss? A. Well, the Keystone is approximately the same size, and the Moss is four or five times as large. THE COURT: I don't understand. A. I mean the Red Marble is four or five times larger deposit than the Moss, and the Keystone is approximately the same size as the Moss." (Italics mine.)

All of the reports made by Northwest show the work at the quarry was deducted for treatment. No objection was made to any of the reports until Mr. Stickney made his investigation. The record also disclosed that Northwest spent between January 1, 1932, and December 31, 1942, $1,370,957.13 in mucking costs. It conclusively appears that

Northwest spent these enormous sums of money based upon agreements and reports made by the state officials.

The state has, through the efforts of Northwest, secured in royalties over seventy thousand dollars—and this from a quarry that was in itself absolutely worthless. Northwest not only spent its money but used its ore to make the Moss ore usable. Did the state deal fairly? The answer must be in the negative. A great injustice would be done to Northwest if the doctrine of estoppel was not applied as against the state in this case.

We should not lose sight of the distinction between the irregular exercise of granted powers and the total absence or want of power. *Corpus Juris Secundum* sets forth this distinction clearly when it says:

"Although a municipality or other governmental agency cannot be estopped by its ultra vires acts, see supra § 143, there is nevertheless a broad distinction to be observed between an irregular exercise of a granted power and the total absence or want of power; and *the rule is that a municipality or other governmental agency may be estopped, as right and justice may require, where the act or contract relied on to create the estoppel was within its corporate powers, although the method of exercising the power was irregular or unauthorized.* This rule has been applied with respect to contracts not complying with the required formalities, or which are claimed not to have been authorized by ordinance, especially where the contracts are within the scope of proprietary, as distinguished from governmental, powers; and to contracts not void but merely voidable, and to contracts not ultra vires or mala prohibita, although entered into by virtue of unconstitutional statutes or invalid ordinances. For the purpose of avoiding liability for injuries to person or property from the construction or maintenance of streets, drains, or sewers, a municipality cannot set up that there has been a failure to comply with some regulation concerning the exercise of the power. Where a municipal corporation dealing with individuals assumes powers on which the validity of its acts depends, and subsequently it develops that the specific powers relied on were not possessed, the municipality is not thereby excused from the performance of its obligations, if they can be performed through the agency of other powers which it does possess." 31 C. J. S. 428, Estoppel, § 144. (Italics mine.)

This distinction is apparent in the case at bar. The state land commissioner had the power under the laws enacted by the legislature to lease the Moss quarry. His actions brought to the school fund a large amount of money secured from a mineral deposit which *would have been entirely worthless* had it not been for the mutual understanding and agreement at which he arrived with representatives of Northwest.

The case of *Reed v. Johnson,* 27 Wash. 42, 67 Pac. 381, 57 L. R. A. 404, is not in point. That case involved a contract made by the owner of land on one side, and an individual on the other. The consideration for the contract was the efforts of the individual to secure the location of a railway depot on the land of its owner. The individual claimed that he had an agreement with three officers of the railway company who were to receive a certain portion of the sale of the land if the depot was located on it. This court held the contract to be illegal, and for that reason refused its enforcement. The facts in that case do not bring it within the requirements necessary to invoke estoppel. The contract itself was illegal, and hence void. That situation is not present in the case at bar.

I can have no objection to the rule stated by the majority, but deny its application to the facts presented here. The cases cited by the majority relate only to illegal contracts, or to cases in which the officers could not make the contract.

"It is a common expression that estoppels are odious and not favored in law. This declaration, however, has usually referred to technical estoppels at common law and is largely confined to the earlier cases. Now estoppels, especially those known as 'equitable' or 'in pais,' are not deemed odious, but are said to be conducive to honesty and fair dealing and promotive of justice and to stand on the broad grounds of public policy and good faith." 19 Am. Jur. 602, Estoppel, § 4.

Estoppel is a preclusion in law, which prevents one alleging or denying a fact in consequence of his own previous act, allegation, or denial, of a contrary tenor. Equitable estoppel, or estoppel *in pais,* is that condition in which justice

forbids that one speak the truth in his own behalf. It stands simply as the rule of law which forecloses one from denying his own expressed or implied admission, which has in good faith, and in pursuance of its purpose, been accepted and acted upon by another. To constitute estoppel *in pais,* three things must occur: (1) an admission, statement, or act inconsistent with the claim afterwards asserted; (2) action by the other party on the faith of such admission, statement, or act; and (3) injury to such other party resulting from allowing the first party to contradict or repudiate such admission, statement, or act.

Equitable estoppel is entitled to the distinction of being one of the greatest instrumentalities to promote the ends of justice which the equity of the law affords. *Knauf & Tesch Co. v. Elkhart Lake S. & G. Co.,* 153 Wis. 306, 141 N. W. 701, 48 L. R. A. (N.S.) 744.

It must be accepted as basically true that the general doctrine that estoppel does not lie against the state while acting in a governmental capacity is a shield for the protection of the public, not a weapon to inflict a wrong upon the individual for the benefit of the public.

"Although a municipality or other governmental agency cannot be estopped by its ultra vires acts, see supra § 143, there is nevertheless a broad distinction to be observed between an irregular exercise of a granted power and the total absence or want of power; and the rule is that a municipality or other governmental agency may be estopped, as right and justice may require, where the act or contract relied on to create the estoppel was within its corporate powers, although the method of exercising the power was irregular or unauthorized." 31 C. J. S. 428, Estoppel, § 144.

Judge Dillon states the rule in substance thus: The defense of equitable estoppel may be asserted against a municipal corporation when the character of the action and the facts and circumstances are such that justice and equity demand that the corporation should be estopped. 3 Dillon, Municipal Corporations (4th ed.) 804, § 675.

Mr. McQuillin says:

" 'Any positive act by municipal officers which may have induced the action of the adverse party, and where it would

be inequitable to permit the corporation to stultify by retracting what its officers had done, will work an estoppel.'." 3 McQuillin, Municipal Corporations (Rev. 2d ed.) 915, § 1185.

*Spokane Street R. Co. v. Spokane Falls,* 6 Wash. 521, 33 Pac. 1072, was an action for injunctive relief, wherein petitioner, the holder of a street railway franchise, sought to prohibit the city from interfering with its track. It was held that the city was estopped to claim that the right to maintain a street railway was not properly authorized. Estoppel was based on the fact that the city had imposed and collected taxes on the property used in furtherance of the franchise. Thus, even though the franchise right was open to the criticism that it had not been obtained by the prescribed legislative procedure, nevertheless a franchise right was acquired by estoppel. (Cited with approval in *State ex rel. Grinsfelder v. Spokane Street R. Co.,* 19 Wash. 518, 53 Pac. 719, 67 Am. St. 739, 41 L. R. A. 515; *Forster v. Raznik,* 46 Wash. 692, 91 Pac. 252; *Theis v. Spokane Falls Gas Light Co.,* 49 Wash. 477, 95 Pac. 1074; *Franklin County v. Carstens,* 68 Wash. 176, 122 Pac. 999; *Gustaveson v. Dwyer,* 83 Wash. 303, 145 Pac. 458; *State ex rel. Washington Paving Co. v. Clausen,* 90 Wash. 450, 156 Pac. 554; *Detroit v. Detroit City R. Co.,* 60 Fed. 161.)

*Commercial Electric Light & Power Co. v. Tacoma,* 17 Wash. 661, 50 Pac. 592, was an action to enjoin a city and its officers from interfering with the franchise of a light company. It appears that, during the term of a contract existing between two light companies allowing each to use the poles of the other to string wires, the plant of one light company was sold to the city, which enjoyed the fruits of that contract thereafter by receiving rental for the use of its own poles and being allowed to continue its wires upon the other company's poles. The city was estopped from cutting down the wires of the light company on its poles, pursuant to an ordinance repealing the franchise ordinance. The holding was grounded upon the theory that an ordinance granting a franchise is in the nature of a contract and

it is not in the power of the city council to destroy rights thus granted.

The question of estoppel as applied to a city acting in its governmental capacity is presented in *Hetherington-Berner Co. v. Spokane,* 75 Wash. 660, 135 Pac. 484. The facts in this case show that the company agreed to erect a building on a foundation to be furnished by the city. The city did not complete the foundation as promised by the secretary of the city's board of public works, and the company suffered damages. In affirming the judgment for the company, this court stated:

"The officer of the city who informed the appellant that the city would start work on the foundation at a particular date was the secretary of the board of public works. It is claimed that there is no evidence that this officer represented the city in the matter referred to, and hence it is not shown that the contractor had the right to place reliance upon his statements. But the city was represented, when entering into the contract, by its board of public works, and the secretary seems at all times to have been the spokesman of that body; in fact, all communications had with the city or its representative, the board of public works, was had through him. This not only furnishes evidence that the secretary had authority to speak for the city, but is sufficient to estop the city from questioning his acts, even were it shown affirmatively that he had exceeded his authority."

This case was cited as sustaining authority by the supreme court in Pennsylvania, in the case of *Breinig v. Allegheny County,* 332 Pa. 474, 2 A. (2d) 842.

This court in *Gustaveson v. Dwyer,* 83 Wash. 303, 145 Pac. 458, held that the acquisition of land by a county as an adjunct of imposing and collecting taxes is the exercise of a governmental function. In discussing the *Franklin County* case, p. 311, the court made this observation:

"In *Spokane Street R. Co. v. Spokane Falls,* 6 Wash. 521, 33 Pac. 1072, the railway company was held to have acquired a franchise right in the street by estoppel growing out of acts of the city. This seems to be a recognition of the rule announced by a number of the courts, that would call for the ultimate conclusion reached by us in *Franklin County v. Carstens,* regardless of whether land acquired at

tax sale by a county for want of other bidders is thereafter held by the county in a proprietary or governmental capacity. Hence, our decision in that case would have been the same whatever our views may then have been upon that question. We adhere to the conclusion there reached, but are of the opinion that, in so far as the language of the decision announces that the land was held by the county in its proprietary capacity, it should be overruled in the light of the authorities above noticed." .

*Washington Water Power Co. v. Spokane,* 89 Wash. 149, 154 Pac. 329, was an action to recover an assessment made for improvements of a city street, payment of which was made under protest. The easement contract originally entered into between plaintiff's grantor and the city, was conditioned upon several covenants, including one of exemption from assessment for establishing and improving the street to be opened on the land granted under the easement. The assessment under protest was for grading and paving many years subsequent to the original establishing of the street. It was held that the city had the power to contract to purchase private property for corporate purposes, though compensation was dependent upon a future contingency. The city, having accepted the benefits under the contract, was estopped to deny the legality of the mode of payment.

This court in *Seward v. Fisken,* 122 Wash. 225, 210 Pac. 378, 27 A. L. R. 1208, held that the county, acting through its treasurer in collecting taxes, acted in a governmental, and not in a proprietary capacity; that the county was estopped to deny that taxes were paid on a given piece of real property where the county treasurer had given a receipt showing taxes paid in return for a check therefor given by the owner's agent, this receipt being then exhibited to a buyer (the complaining party in this action), who in turn, in reliance thereupon, purchased the property, the check proving to be worthless, and the entry of record of tax payment being deleted for that reason.

This court held in *Bennett v. Grays Harbor County,* 15 Wn. (2d) 331, 130 P. (2d) 1041, that a county which had acquired land under general tax foreclosure proceedings was not estopped to dispute the title of one who had pur-

chased timber thereon under distraint proceedings as personal property, it appearing that the county had acted throughout in its governmental capacity, and the acts of the county treasurer and his deputy in distraining the standing timber and executing a bill of sale therefor, were unauthorized and illegal, the purchaser being bound in his dealing with such officers, by constructive notice of the law and the public records as to the measure of their functions and powers. In so deciding, the court took cognizance of the doctrine that equitable estoppel may under certain conditions be applied against the state and its political subdivisions; however, it will not be applied against the state when not acting in a proprietary capacity, unless its application is clearly necessary to prevent *manifest injustice*. It was further stated that the case was not one deserving of the application of the rule coming within the exception noted. There is no holding of what would, or might be, considered "manifest injustice" other than on p. 343, in discussing *Franklin County v. Carstens*, 68 Wash. 176, 122 Pac. 999, it is said:

"The facts in that case were clearly such as to warrant the application of the principle of equitable estoppel against the county, in order to prevent what would otherwise have been a manifest gross injustice."

A municipal corporation has the power to alter its contracts by waiving conditions found to be unsatisfactory, and in so doing, may estop itself like other parties to a contract. *Moran v. Miami Commissioners*, 67 U. S. 722, 17 L. Ed. 342; *Pendleton County v. Amy*, 80 U. S. 297, 20 L. Ed. 579; *Randolph County v. Post*, 93 U. S. 502, 23 L. Ed. 957; *Boone County v. Burlington & Missouri River R. Co.*, 139 U. S. 684, 35 L. Ed. 319, 11 S. Ct. 687; *City R. Co. v. Citizens' Street R. Co.*, 166 U. S. 557, 41 L. Ed. 1114, 17 S. Ct. 653; *Louisville v. Cumberland Tel. & Tel. Co.*, 224 U. S. 649, 56 L. Ed. 934, 32 S. Ct. 572; *Essex v. New England Tel. Co.*, 239 U. S. 313, 60 L. Ed. 301, 36 S. Ct. 102.

In *State ex rel. Roberson v. Pell City*, 157 Ala. 380, 47 So. 246, it was sought to dissolve the corporation because of a noncompliance with the law at the time of incorpora-

tion. The facts disclosed that for sixteen years after the purported incorporation the town had exercised all of the functions of a duly organized corporation, and certain acts of the state legislature had recognized it as a municipal corporation. The supreme court of Alabama held that, because of laches, the state was deprived of the right of inquiring into the validity of the corporation.

The court in *State ex rel. Martin v. Gadsden*, 216 Ala. 243, 113 So. 6, held that in a *quo warranto* proceedings instituted by the state for its own peculiar purposes, the doctrine of waiver, operating to the same effect as an estoppel *in pais*, may be appealed to and applied in defense.

The last-two-mentioned cases were cited in *Brown v. Tuskegee Light & Power Co.*, 232 Ala. 361, 168 So. 159, as authority for holding that the doctrine of estoppel *in pais* applied against the state or its governing authorities.

The case of *Valdez v. Valdez Dock Co.*, 5 Alaska 399, concerned an appeal from a conviction for violating an ordinance prohibiting the operation of a wharf and the charging of a fee for the performing of wharfage service by anyone other than a municipally owned wharf. At the time of the passage of the ordinance under which the conviction was secured, the defendant company operated, unmolested, a wharf for about fifteen years, offering the community for the first two or three years of that period the only such service available. Some time after a competing wharf was built by a private owner, the city purchased it, and operated it as a municipal project. During the entire time, the defendant company paid a tax levied upon their enterprise on a tonnage basis, the proceeds of this tax going to the public school fund. In order to cut off all competition, the penal ordinance involved was passed.

It was held that, while the town had authority to legislate to regulate and tax such an enterprise as conducted by defendant, they might not legislate it out of existence, for they were estopped to object to the presence and use of a dock erected without a franchise grant from the city, which dock had been operated and taxed without objection

for many years, the court saying that to hold otherwise would be to sanction confiscation without recompense.

Accord: *United States v. British Schooners,* 5 Alaska 11.

*Book v. Polk,* 81 Ark. 244, 98 S. W. 1049, involved an action to settle title between parties both of whom had purchased the same tract from the common grantor, a levee district. It appeared that the proper officers of the district had, acting upon proper authorization, made the first sale for part cash and had received notes for the balance, giving a deed therefor. The subsequent sale and deed were based on an all-cash payment.

It was held that, although the sale was by the act of authorization limited to one for all cash, with deed to be issued on payment, yet, nonetheless, the first sale and deed estopped the district to deny its validity, inasmuch as they had received benefits at the expense of the contracting party. Therefore, one claiming under the district was likewise estopped to deny the validity of the former sale because of the exercise of unauthorized method of contracting.

*Sumpter v. Buchanan,* 128 Ark. 498, 194 S. W. 27, was a case in which a judgment against the county was obtained by one Palmer in a United States district court. The judgment was for a large amount and contained an order requiring a special levy to amortize it. As a result of the judgment and levy, the county's finances were severely embarrassed. Seeking to gain respite from the tremendous burden, the county contracted with a local law firm, of which Sumpter was a member, to prosecute in the district court an attempt at settlement of the judgment by way of reduction in the annual levy. This contract expressed a given fee, contingent upon enumerated objectives being attained. Having been successful in the prosecution of the attempt at reduction as contracted for and subsequent to payment of a part of the stipulated fee, the payment of the remainder of the fee was herein contested on the ground that the action of the county in contracting for additional legal counsel outside of the county attorney was illegal and unauthorized.

It was held that by law the county was authorized to engage such counsel as a matter of discretion, and, by prior cases, the exercise of that discretion had been limited to circumstances of more than ordinary importance; the present case falling within that class, the act of the county in making the contract for legal counsel was authorized.

This case in effect is an illustration of the county being estopped to deny the contracts or authorized acts of its proper officers, particularly wherein benefits have been received, giving rise to circumstances wherein it would be inequitable to hold otherwise.

See, also, *Fort Smith v. United States Rubber Co.*, 184 Ark. 588, 42 S. W. (2d) 1004; *Fordyce v. Dallas County*, 195 Ark. 552, 113 S. W. (2d) 500; *Brown v. Tuskegee Light & Power Co.*, 232 Ala. 361, 168 So. 159; and *Arkansas Municipal Bond Bureau v. Fouke Special School Dist. No. 15*, 203 Ark. 677, 158 S. W. (2d) 28.

*Los Angeles v. Cohn*, 101 Cal. 373, 35 Pac. 1002, was an action brought to recover the possession of a small tract of land upon which a portion of defendants' building rested. The city claimed the land as a part of a public street. Prior to the erection of the building, and with knowledge on the part of both parties, the city instructed its agent, the city attorney, to investigate and report to the city council its rights to the land in question. This investigation resulted in a report that the city had no claim or title, which report was duly filed and entered on the minutes of the council proceedings. Defendants' grantors proceeded on the strength of the report to erect a large and valuable building on the tract. Nothing was ever done until this action was instigated some twenty years later.

In holding that it would be inequitable to allow the city to recover, the court recognized that the laws relative to limitations of actions may not be invoked against the state; in other words, defendant did not acquire title by adverse possession; however, the court did recognize the fundamental equitable doctrine of estoppel and its applicability as a defense in an action by the state, limiting its application to "exceptional cases" of which this was one. The principle

and its application is well phrased by the court in the following language:

"If we concede the existence of the principle of estoppel *in pais* against the public in certain exceptional cases, then this case is rightly decided, for this is an exceptional case. If this character of estoppel may be pleaded where justice and right require it, then it may be successfully pleaded here, for justice to these defendants demands it. There are limits beyond which even a city in representing the rights of the public may not go, and we think the city in the present action has gone beyond those limits. If the city had expressly agreed by its officers with defendants' grantors, even in parol, that a certain line should constitute the boundary line between the street and the grantor's property, and upon the faith of such agreement the grantors had erected a block of buildings flush with the line of the street as agreed upon by all parties, it would be a hard law that would allow the city to repudiate that agreement, and destroy the grantor's property. No court should countenance such a thing, and an estoppel *in pais* will rise up in the pathway of a city to bar it and its principal, the people, from the commission of such a grievous wrong; and to give the acts of this city a very limited meaning we think its conduct in the present case at least equivalent to an oral agreement as to the location of the true boundary line of the street."

Among the decisions of the California courts lending support to the conclusion above set out, I note the following: *Briney v. Santa Ana High School Dist.*, 131 Cal. App. 357, 21 P. (2d) 610; *Times-Mirror Co. v. Superior Court*, 3 Cal. (2d) 309, 44 P. (2d) 547; *Los Angeles v. Los Angeles County*, 9 Cal. (2d) 624, 72 P. (2d) 138, 113 A. L. R. 370; *Contra Costa Water Co. v. Breed*, 139 Cal. 432, 73 Pac. 189; *Los Angeles County v. Cline*, 185 Cal. 299, 197 Pac. 67; *Pedro v. Humboldt County*, 217 Cal. 493, 19 P. (2d) 776; *McGee v. Los Angeles*, 6 Cal. (2d) 390, 57 P. (2d) 925; and *Adams v. Ziegler*, 22 Cal. App. (2d) 135, 70 P. (2d) 537.

The rule relative to estoppel as applied to a municipality acting in a governmental capacity is well stated in *Crocker v. Collins*, 37 S. C. 327, 15 S. E. 951, where it is said:

"We think, therefore, that mere adverse possession, for the statutory period, of a street or alley in a town, which is a public highway, cannot confer a title. But where such

possession is accompanied with other circumstances, which would render it inequitable that the public should assert its rights to regain possession, then, upon the principle of estoppel, a party may be protected against the assertion of right by the public, in order to prevent manifest wrong and injustice. For example, when a party, either under an honest conviction of right, has taken possession of a portion of one of the streets or alleys of a town, and expended his money in erecting buildings thereon, without interference on the part of the public, these or, perhaps, other circumstances, connected with adverse possession for the statutory period, may afford good ground for estoppel."

*Schroeder v. O'Neill,* 179 S. C. 310, 184 S. E. 679, holds that the payment of an initial license fee by lot holders, and annual assessments thereafter, in reliance on official resolutions of the board of township commissioners extending the time for building on lots until one year after the termination of litigation involving the validity of license, estopped the board and party bringing action in name of the board from contending that licenses were void for failure to build the dwelling within a year from the date thereof, as designed by law. In other words, a municipal or other subordinate governing body can be bound by an estoppel in certain cases where the unusual and exceptional situations would render it manifestly unjust to rule otherwise.

Accord: *Chafee v. Aiken,* 57 S. C. 507, 35 S. E. 800; *Southbound R. v. Burton,* 67 S. C. 515, 46 S. E. 340; *Board of Com'rs v. Holiday,* 182 S. C. 510, 189 S. E. 885, 109 A. L. R. 1496; and *Salley v. McCoy,* 189 S. C. 157, 200 S. E. 724.

In the case of *Board of Com'rs v. Desmond,* 104 Colo. 269, 90 P. (2d) 619, it was held that, where a physician renders medical services to a nonresident indigent person, he is entitled to compensation therefor from the county in which the service is rendered, by virtue of legislative enactment so providing. Also, where, as in this case, the commissioners reject an unverified claim and an appeal is taken, on review, the county will be estopped to attack the validity of the claim because of the lack of formal verification.

In *Missouri River Tel. Co. v. Mitchell,* 22 S. D. 191, 116 N. W. 67, the telephone company instituted an action to

restrain a city from interfering with the construction and operation of a telephone line in the city. The court found that the city authorities had given the company a consent to erect and operate a telephone line in the city, and that the company, depending on the consent, had erected a telephone line. The court then concluded the city was without authority to remove the line and prevent the company from operating it (such action on the part of the city being based on the invalidity of the assent given because of lack of strict compliance with the formal requirements of giving such assent), but that the city, having ratified the informal assent by formal acceptance and publication of the allegedly informal resolution, was estopped to deny the assent.

Accord: *Slagle & Co. v. Elk Point Independent Consol. School Dist.*, 40 S. D. 73, 166 N. W. 234; *Tubbs v. Custer City*, 52 S. D. 458, 218 N. W. 599.

The case of *Waterbury Sav. Bank v. Danaher*, 128 Conn. 78, 20 A. (2d) 455, holds that the administrator of the state's unemployment compensation act was estopped to change his decision relative to the liability of plaintiff bank for contributions, on the ground that to make that liability retroactive would place unwarranted hardship upon the contributor.

*Winter Haven v. State ex rel. Landis*, 125 Fla. 392, 170 So. 100, was a case in which the court held that, in a *quo warranto* proceeding seeking a judgment of ouster against the city, the state was estopped to attack the validity of the municipality, where for years the state had recognized its existence by legislative action and had acquiesced in the exercise by the municipality of its powers. In denying the writ, the court stated the rule as follows:

"While the State may not ordinarily be estopped from the exercise of its sovereignty or police powers, or from acting in vindication or enforcement of public rights by the laches or neglect of its officers, agents or servants, there are many cases which hold that even the sovereign State may be estopped under certain circumstances and conditions. Indeed, the general doctrine seems to be that the state may be estopped from attacking the validity of a municipal corporation, where for years the state has recognized the existence

of the municipality by legislative action, and has acquiesced in the exercise of its powers, and where the public interests do not require that the State shall take such drastic action as would result in the destruction or paralysis or crippling of the municipal corporation. See 10 R. C. L. 704-706, and cases cited; 21 C. J. 1106 and cases cited; and also the cases hereinabove discussed and cited. And this court in *State v. Beardsley,* 77 Fla. 803, 82 So. 794, held that where the state had assessed property of a decedent to his testamentary trustee, and the state sued the trustee for the taxes, it would not be permitted to show that the property was held in a different fiduciary capacity. We have held that counties and municipalities may be estopped. In *State v. Thursby,* 112 Fla. 257, 150 So. 252, it was held that where county commissioners had made an appropriation for a county fair and had approved an assessment from the Fair Association to a bank, they were estopped from denying the obligation of the county to the bank. See also *Miami v. Fla. E. C. Ry. Co.,* 79 Fla. 539, 84 So. 726. And we have held in a long line of cases that a municipality may be estopped to deny that its authority to issue bonds, vested in the municipality by a valid statute, was properly exercised in the issuance of the bonds, especially where such bonds had passed into the hands of *bona fide* holders for value. *State v. Greer,* 102 So. 739, 88 Fla. 249."

The court in so holding discussed a wealth of sustaining authority, namely: *State ex rel. Roberson v. Pell City,* 157 Ala. 380, 47 So. 246; *State v. Leatherman,* 38 Ark. 81; *Jameson v. People,* 16 Ill. 257, 63 Am. Dec. 304; *State ex rel. Brown v. Westport,* 116 Mo. 582, 22 S. W. 888; *State ex rel. Young v. Harris,* 102 Minn. 340, 113 N. W. 887, 13 L. R. A. (N.S.) 533; *People ex rel. Attorney General v. Alturas County,* 6 Idaho 418, 55 Pac. 1067, 44 L. R. A. 122; *State v. Pawnee County,* 12 Kan. 426; *People v. Maynard,* 15 Mich. 463; *Attorney General v. Methuen,* 236 Mass. 564, 129 N. E. 662; *State ex rel. West v. Des Moines,* 96 Iowa 521, 65 N. W. 818, 31 L. R. A. 186; *State ex rel. Davis v. Eau Gallie,* 99 Fla. 579, 126 So. 124; *State v. Sarasota,* 92 Fla. 563, 109 So. 473; *State ex rel. Davis v. Clearwater,* 106 Fla. 761, 139 So. 377, 146 So. 836.

*State ex rel. Landis v. Sovereign Camp, W. O. W.,* 131 Fla. 867, 180 So. 33, was a proceeding in *quo warranto* by

the attorney general for the benefit of certificate holders against the society. It was held that the state was estopped to attack the validity of the action taken by the society in increasing its rates to the holders without express authorization by the state, in view of the lapse of eighteen years following such increase, during which time there was no objection made. In so holding, the court stated:

"There has in times past existed some confusion in the law as to whether or not the doctrine of estoppel could be raised against the State but as to the facts shown here, there seems no doubt that it may be done. The State has each year during the eighteen years the amended by-laws have been in effect, through its State Treasurer, who is clothed with power to do so, renewed Respondent's license and recognized its right to do business in the State. Under such state of facts the Attorney General will not be permitted to raise the question. *State, ex rel. Caldwell, v. Lincoln Street Railway, et al.,* 80 Neb. 333, 352, 114 N. W. 422; *State v. Bailey, et al.,* [19] Ind. 452; *State, ex rel. Jordan, v. City of Greenwood,* 157 Miss. 836, 129 So. 682; *State of Iowa v. Carr,* 191 Fed. 257. Also recognized in *State, ex rel. Buford, v. Pinellas County Power Co.,* 87 Fla. 243, 100 So. 504."

Accord: *Smith v. Woodruff,* 147 Fla. 303, 2 So. (2d) 583.

*Citizens Bank v. Rockdale County,* 152 Ga. 711, 111 S. E. 434, was an action to recover on a note evidencing an obligation on the part of the county to pay the sum indicated thereon. It was held that the county was estopped to deny the obligation on the grounds of lack of authority, where the authority to borrow money for casual deficiencies was conferred upon the county by the state constitution, and the county in pursuance thereof borrowed money to defray current expenses.

The court had this to say:

"It is true that the powers of all public officers are defined by law, and all persons must take notice thereof; and the public can not be estopped by the acts of any officer done in the exercise of a power *not conferred.* [Citing authority.] But the converse of this proposition is equally true, *that the public can be, and will be, estopped by the acts of any public officer done in the exercise of a power which is expressly conferred by law."* (Italics mine.)

Accord: *Brinson v. Jackson,* 168 Ga. 353, 148 S. E. 96.

The decision in the case of *Jefferson v. Holder,* 195 Ga. 346, 24 S. E. (2d) 187, holds that a demurrer interposed by the individual defendants was properly sustained where the action should have been against a corporation, the existence of which the plaintiff city was estopped to deny, having had various business transactions with the corporation, thereby recognizing it as such. The basis for the holding was an existing statute to the effect that a person who has dealt with a corporation may not collaterally attack its existence. A splendid discussion of whether or not the principle of estoppel may be applied to a state or its political subdivisions resulted in a statement that it may be so applied in those cases wherein equity and justice demand it, the court quoting at length from 19 Am. Jur. 820, § 168, and citing several of the cases offered by the author of that work in substantiation of the statement.

In *Lucier v. Manchester,* 80 N. H. 361, 117 Atl. 286, the action was instituted by an attorney to collect for services rendered the city in performance of a contract of hiring. It was held that the city, by having acquiesced in the employment and accepted the benefits therefrom, was estopped to deny liability on the grounds that the contract was invalid by reason of not having been formally made. This ruling reiterates the doctrine established in the jurisdiction that, at least as to matters of contract, the state is estopped by ratification or acceptance of benefits in the same manner as an individual, citing *Amazeen v. Newcastle,* 76 N. H. 250, 81 Atl. 1079, *Gilbert v. Manchester,* 55 N. H. 298, *New London v. Davis,* 74 N. H. 56, 65 Atl. 107, *Hett v. Portsmouth,* 73 N. H. 334, 61 Atl. 596, and *Skinner v. Manchester,* 72 N. H. 299, 56 Atl. 313.

In *Opinion of the Justices,* 93 N. H. 478, 39 A. (2d) 765, it was held that the state was estopped to deny liability for the payment of a service charge imposed by the city for the use of a sewer where the state law authorized that method of defraying the expense of construction and maintenance of the sewer by the city. The justices stated that such charge was not a tax or assessment, but a charge for

service rendered, and the state, having accepted the service, and having had the benefit thereof, impliedly contracted to pay the charge for the service.

*New Castle v. Hunt,* 47 Ind. App. 249, 93 N. E. 173, was an action to enjoin the city from changing the boundary lines of an alley to the detriment of property adjoining and improvements thereon. It was held that the city was estopped to deny the boundaries as they had existed for three quarters of a century, as originally fixed by the city plat, inasmuch as to do so would work severe damage to plaintiff's property. The court made this statement of the applicable rule:

"It is true that the doctrine of adverse possession does not apply, as a rule, to the occupancy of streets and alleys. However, there is a principle recognized by the authorities, that where landowners abutting on a highway or street, which is not actually located by monuments, have for a long period of years marked the boundaries of such highway by permanent improvements, the public will afterwards be estopped to assert a claim to such highway to the injury of such abutting landowners. *Hamilton v. State* (1886), 106 Ind. 361; *Anderson v. City of Huntington* (1907) 40 Ind. App. 130; *Brooks v. Riding* (1874), 46 Ind. 15."

Accord: *Carr v. State ex rel. Coetlosquet,* 127 Ind. 204, 26 N. E. 778, 22 Am. St. 624, 11 L. R. A. 370, and *State ex rel. Hunter v. Town of Hessville,* 191 Ind. 251, 131 N. E. 46, 132 N. E. 588; also, *State v. Wright,* 97 Ind. App. 660, 175 N. E. 666; *Moore v. Kokomo,* 223 Ind. 293, 60 N. E. (2d) 530.

The case of *Chicago v. Illinois Steel Co.,* 229 Ill. 303, 82 N. E. 286, 120 Am. St. 258, holds that a city will be held to be equitably estopped to assert its right in a street shown upon a plat, which, though executed with the statutory requirements, covered property not at that time within the city limits, where the city has for over forty years acquiesced in the exclusive occupation of the platted territory by the owners thereof and their predecessors in title, who erected costly buildings without regard to such street and in the belief that there was no street there, or that, if there ever had been one, it had been abandoned by

the city. The court based its holding on the following excerpt from *People v. Rock Island,* 215 Ill. 488, 74 N. E. 437:

" 'It has frequently been decided that the doctrine of estoppel *in pais* is applicable to municipal corporations, but that they will be estopped or not, as justice and right may require. There may be cases where, under all the circumstances, to assert a public right would be to encourage and promote a fraud. Where a party acting in good faith under affirmative acts of a city has made such extensive and permanent improvements that it would be highly inequitable and unjust to destroy the rights acquired, the doctrine of equitable estoppel will be applied. The hardships that would result from a contrary holding, and the necessity of raising an estoppel in particular cases to prevent fraud and injustice, have induced the establishment of the rule, and it has been several times said that there is neither danger to the public nor injustice in the application of the doctrine. In the exercise of proper diligence the public authorities may prevent encroachments upon public right, and if they do not, any citizen may take the necessary steps to do so, and if there is not only a failure to act by either, but affirmative action by the public authorities with the apparent approval of every one interested, under which the situation is changed and permanent improvements are made, the principles of equity require that the public should be estopped.' "

*Chicago v. Pittsburgh, C., C. & St. L. R. Co.,* 244 Ill. 220, 91 N. E. 422, 135 Am. St. 316, was a case in which the city passed a track elevation ordinance requiring the railroad company to do many things, the railroad company thereafter electing to make the necessary changes at great expense. It was held that the city was estopped to deny the obligations placed upon it by the ordinance on the ground that the ordinance lacked validity in that it was not published as required by statute, the court stating:

"But a city is not entirely exempt from all the rules of honesty and fair dealing that are applicable to individuals and private corporations. If a city may lawfully exercise a power, it may be equitably estopped to question the validity of its exercise on account of the manner in which it is done or the lack of required formalities, as right and justice may require. [Citing cases.]"

*People ex rel. FitzHenry v. Union Gas & Electric Co.,*
254 Ill. 395, 98 N. E. 768, Ann. Cas. 1916B, 201, was a *quo
warranto* proceeding against a corporation having a franchise from the state to engage in the gas business, to require
it to show by what right it exercised its franchise in the
streets of a city. The city had for ten years permitted the
company to do such things as the city had the power to
authorize, and the company had expended large sums of
money in attempting to comply with the requirements of
the municipal authorities. The city was held to be estopped
to oust the company from continuing the exercise of its
franchise merely because it was not granted permission by
ordinance to use the streets, such exercise being subject
to the control of the city, however. The court adhered to
the rule that the doctrine of estoppel *in pais* may in a proper
case be invoked against a city.

Accord: *People v. Cleveland, C., C. & St. L. R. Co.,* 269
Ill. 555, 109 N. E. 1064; *Posey v. Commissioners of Highways,*
274 Ill. 30, 113 N. E. 136; *Melin v. Community Consol. School
Dist.,* 312 Ill. 376, 144 N. E. 13; *Webster v. Toulon Tp. High
School Dist.,* 313 Ill. 541, 145 N. E. 118; *Trustees of Schools
v. Cahokia,* 357 Ill. 538, 192 N. E. 565; *Clokey v. Wabash R.
Co.,* 353 Ill. 349, 187 N. E. 475; *People ex rel. Petty v. Thomas,*
361 Ill. 448, 198 N. E. 363; *Chicago Park Dist. v. Herczel
& Co.,* 373 Ill. 325, 26 N. E. (2d) 119; *Board of Supervisors,
Logan County v. Lincoln,* 81 Ill. 156; and *People v. Rock
Island,* 215 Ill. 488, 74 N. E. 437, 106 Am. St. 179.

It was held in *Davenport v. Boyd,* 109 Iowa 248, 80 N. W.
314, 77 Am. St. 536, that where a city taxed property and
levied special assessments on it for thirty years, and defendant occupied it under claim of right for nineteen years,
during which time it did not appear that he deceived or
misled the officers of the city, nor that he was guilty of any
bad faith, and during all of that time the right of the city
to the property could have been readily ascertained, it was
estopped to claim the same as against defendant, even
though the statute of limitations may not run against a
municipal corporation. The court stated:

"But it is the well-settled rule in this state that counties, cities, and towns may so deal with real property within their limits as to be estopped to assert title to it; and that has most frequently occurred by refraining from exercising acts of ownership over the property, by treating it as owned by private persons, and by subjecting it to the payment of various public charges."

In the case of *Bridges v. Grand View,* 158 Iowa 402, 139 N. W. 917, where there was a controversy over a street boundary line, it was held that the city was estopped to deny the line as that established by long usage, and the erection and maintenance of valuable buildings and other improvements in reliance upon that line.

This same doctrine is recognized in the later case of *Christopherson v. Forest City,* 178 Iowa 893, 160 N. W. 691.

Accord: *Sioux City v. Chicago & N. W. R. Co.,* 129 Iowa 694, 106 N. W. 183, 113 Am. St. 500; *Plymouth County v. Koehler,* 221 Iowa 1022, 267 N. W. 106; and *Wisdom v. Board of Supervisors of Polk County,* 236 Iowa 669, 19 N. W. (2d) 602.

In *Boston v. Nielsen,* 305 Mass. 429, 26 N. E. (2d) 366, the supreme court of Massachusetts had before it a question relative to estoppel as applied to the city of Boston. The following portion of the syllabus indicates the ruling of the court:

"Where municipality in patient's action for injuries prevented inclusion of amount of hospital charges on ground that patient had not paid or become liable for such charges and that credit had been given therefor to her husband, in municipality's suit to establish indebtedness for board, lodging and medical services furnished by municipal hospital and to set off indebtedness against judgment obtained by patient against municipality, municipality would not be permitted to take inconsistent position that patient was liable for such charges and should have recovered for them as part of her damages in her action against municipality."

In *Rochester v. North Side Corp.,* 211 Minn. 276, 1 N. W. (2d) 361, it was held that where private parties had in good faith, and in the belief that a street had been abandoned, erected valuable improvements thereon without

objections from the municipality, and had continued in possession for more than eighty-three years, the city was estopped to question the right of the private parties to that portion of the street upon which the improvements had been made. In passing upon the questions presented, the court said:

"If estoppel is not applicable to a state of facts such as we have here, then surely that equitable principle is not of much value to property owners. As between individuals, there can be no question about its applicability. We therefore unhestitatingly conclude that where, as here, actual use has been publicly exercised by a physical laying out and the continual improvement and use of a street as thus laid upon adjoining property, there can be no question about the propriety and legality of the conclusion reached by the court."

I find that in *American LaFrance & Foamite Industries v. Clifford,* 267 Mich. 326, 255 N. W. 596, that the action of a municipality in purchasing a fire engine was *ultra vires,* but that the city had retained the benefits derived from the use of the fire engine. It was held that the city was estopped to deny that the purchase was made by a formal action of the council. In so deciding, the court followed the precedent established by seven Michigan cases.

In *State ex. inf. McKittrick v. Springfield City Water Co.,* 345 Mo. 6, 131 S. W. (2d) 525, it appeared that a corporation had a franchise to operate a waterworks for a term of twenty years, or until purchased by the city. A considerable time after the expiration of the twenty-year period, the city sought to oust the company from the use of the street. It further appeared that, during the period between the expiration of the twenty years and the trial of the action, the city had passed several ordinances requiring an extension of services. In deciding the case, the court in a unanimous opinion stated:

"When one of the parties to a contract expressly places a certain interpretation upon it, not by his mere silence but by a long series of positive acts, the other party is certainly entitled to rely upon such interpretation. That the

respondent in this case did rely upon the interpretation placed upon the franchise is obvious. The elements of representation and misreliance are therefore both present in this case. As to the change of position of the respondent brought about by such misreliance there can be no doubt. It has expended large sums of money for capital increases in Springfield. It has issued securities which have passed into the hands of innocent purchasers throughout the country, obviously based upon its belief that it had a perpetual franchise terminal only by the purchase of its plant at the fair and reasonable market value thereof.

"We are of the opinion, that to grant a writ of ouster against the respondent would be against right and justice and we therefore hold that the city is now estopped to deny that respondent has a perpetual franchise."

Missouri cases of like import are: *State ex inf. McKittrick v. Missouri Utilities Co.*, 339 Mo. 385, 96 S. W. (2d) 607, 106 A. L. R. 1169; *Barkshire v. Drainage Dist. No. 1 Reformed*, 136 S. W. (2d) (Mo. App.) 701; *State ex inf. Wilkerson v. Missouri Utilities Co.*, 345 Mo. 732, 137 S. W. (2d) 456; *Howard County v. Snell*, 349 Mo. 386, 161 S. W. (2d) 238; and *Chariton River Drainage Dist. v. Latham*, 237 Mo. App. 1010, 170 S. W. (2d) 433.

The court of appeals of Maryland had before it the case of *Camden Sewer Co. v. Salisbury*, 162 Md. 454, 160 Atl. 4, in which the following situation was presented: The city council of Salisbury sought by action to compel the Camden Sewer Co. to sell and transfer its sewer system to the city in accordance with the option purchase terms of the franchise ordinance which provided a transfer to the city. The city also secured an injunction preventing the company from extending its system. The city thereafter dismissed the action, whereupon the company commenced an action for specific performance to compel the city to purchase the sewer system owned by the company. A demurrer was by the trial court sustained to the complaint filed by the company. In reversing the judgment, the court made the following statement:

"The city, having filed its bill for specific performance and prayed that the company be required to transfer and assign to the city said sewerage system 'upon the payment

by the plaintiff to said defendant of the cost thereof plus interest as may be determined by this court,' and, pending the determination of the case, having sought and obtained from the chancellor an injunction restraining the company from performing part of its ordinary functions, is now estopped to say that the option has not been converted into a contract susceptible of specific performance."

The supreme court of New Jersey had before it the case of *Garber v. Board of Health,* 4 N. J. Misc. 83, 131 Atl. 638, in which it held that the city of Paterson was estopped from refusing to issue a license to operate an abattoir, after the applicant had performed all conditions imposed by the city at an earlier meeting of the board of health.

The same court approved the above rule in *Schulz v. State Board of Education,* 131 N. J. L. 350, 36 A. (2d) 907.

The facts in *Derby Oil Co. v. Oxford,* 134 Kan. 59, 4 P. (2d) 435, were: When oil was discovered under the city of Oxford, the city passed an ordinance regulating the drilling for oil. A couple of oil companies then started injunction suits to test the validity of the ordinance. The mayor explained to the company concerned in this case that it was not necessary to file a suit, and that no prosecution would be instituted against it for drilling during the time the validity of the ordinance was being tested. Relying upon the statement of the mayor, the company proceeded to drill in violation of the ordinance, and no action was taken toward a prosecution. After the ordinance was held valid, the company ceased to violate it. The city then proceeded to prosecute, with the result that a judgment of two hundred thousand dollars was assessed. The supreme court cited several cases and then held:

"In all the above cases either the municipal officers stood by and watched the ordinance being violated and did nothing about prosecuting till a great deal of expense had been incurred by the person seeking to invoke estoppel, or some municipal officer approved the violation of the ordinance and this action was later ratified by the other officials by acquiescence. Here the mayor of the city had advised this company to go ahead and drill, and promised that it would not be prosecuted. This was the businesslike action for the mayor to take. The city would not have been any better off

had the drilling of these particular wells been done while a suit was being prosecuted with reference to them. We have seen by the Marysville case, *supra*, that the company could not have been prosecuted, even had there not been an order enjoining it issued by the court. Since the trial court has found that the mayor did give the promise that is claimed by appellant, and the members of the city council stood by for two years and let the ordinance be violated, thereby ratifying and approving the promise of the mayor, it would be manifestly unfair and inequitable to hold that failure to file a suit in view of the mayor's promise would make appellant liable to prosecution. Following the rule set out in the above authorities and in 10 R. C. L. 707, 21 C. J. 1190, *Webster v. School District*, 313 Ill. 54, we conclude that this is a case where justice and right require that it be held that when the mayor advised the company to go ahead and violate the ordinance while its validity was being tested, and the council stood by and acquiesced in the violation, the city council should not be permitted to stultify itself by subsequently prosecuting the company for a violation of the ordinance."

See, also, *Hubbell v. South Hutchinson*, 64 Kan. 645, 68 Pac. 52, and *Cole v. Kanopolis*, 159 Kan. 304, 153 P. (2d) 920.

It appears in *Corbin v. Payne*, 288 Ky. 566, 156 S. W. (2d) 850, that an action was begun to collect damages for injuries sustained on a bridge, the city defending upon the ground that the bridge was not within the city limits. The evidence showed that the annexation of the territory upon which the bridge was located had never been consummated. It was shown, however, that for a long time the residents of that territory had paid city taxes and had been furnished city lights. The court held that the city was estopped to maintain its defense by saying:

"That conclusion is that a municipality may not reap the benefits and at the same time disclaim the responsibilities arising from the unresisted inclusion within its boundaries of territory sought to be annexed by defective or uncompleted proceedings. It may at any time repudiate the status thus created, but not so as to escape liability for its acts or omissions occurring previously for which it would have been liable had the status been legally established."

The supreme court of Idaho held in *Boise City v. Wilkinson,* 16 Idaho 150, 102 Pac. 148, that equitable estoppel will be invoked against a city where its mayor deeded a portion of a street to an occupant and the city had recognized the private ownership therein for a period of thirty-eight years, and the occupant had placed valuable and permanent improvements on that portion of the street.

This case was cited with approval in *Robinson v. Lemp,* 29 Idaho 661, 161 Pac. 1024.

In deciding that equitable estoppel would apply against a city while acting in its governmental capacity, the supreme court of Pennsylvania in *Breinig v. Allegheny County,* 332 Pa. 474, 2 A. (2d) 842, made the following statement:

"Appellees received a permit to cut the curb for the driveways from the permit clerk of the Department of Public Works of Allegheny County, on a form customarily issued for laying pipe lines; it contained a reference to an agreement between the permittees and the county commissioners. Appellants contend that the issuance of this permit was in excess of the clerk's authority, as he was instructed by the county commissioners to issue no permits for cutting curbs without referring the matter to them. It is true one dealing with municipal officers is generally bound to know the limitations on their authority, particularly where the limitation is imposed by statute or ordinance and is therefore of record. But a municipality like a private corporation is subject to the doctrine of estoppel: *Philadelphia v. Anderson,* 142 Pa. 357; *New Castle City v. Withers,* 291 Pa. 216, 219. It may be estopped to deny the authority of its agents and employees to act if it has the power to, and by its conduct does, clothe an agent with the appearance of authority: *Mottin v. Board of Commissioners,* 89 Kan. 742, 133 Pac. 165; *Hetherington-Berner Co. v. Spokane,* 75 Wash. 660, 135 Pac. 484, though it cannot be bound for an act of its agent in excess of its corporate powers, or in violation of positive law, or for an act requiring legislative or executive action.

"The issuance of a permit is within the lawful powers of the county; moreover, it is an act usually performed by a clerk. The issuance of licenses and permits under conditions laid down by the legislative authorities is a ministerial or administrative function. The county commissioners un-

doubtedly had the power to issue the permit in question through their designated administrative agent. It has been shown that the construction of the driveways and the cutting of the curbs was in itself lawful and in no way in conflict with the interests of the public. The county cannot deny the validity of the permit under which appellees acted in expending money for construction of the driveways."

I do not feel it necessary to quote from any other cases in the United States, but will simply cite the following cases from the various states which adhere to the rules already announced: *Clerihew v. Baker,* 109 Mont. 317, 96 P. (2d) 269; *Southwest Securities Co. v. Board of Education,* 40 N. M. 59, 54 P. (2d) 412; *May v. Kearney,* 145 Neb. 475, 17 N. W. (2d) 448; *Oliver v. Synhorst,* 48 Ore. 292, 86 Pac. 376, 7 L. R. A. (N.S.) 243; *State ex rel. Simmons v. Wieber,* 145 Ohio 121, 60 N. E. (2d) 687; *New Amsterdam Cas. Co. v. Board of Education,* 124 Okla. 101, 253 Pac. 1012; *State ex rel. City of Jasper v. Gulf States Utilities Co.,* 185 S. W. (2d) (Tex. Civ. App.) 501; *Glasscock v. Permian Oil Co.,* 185 S. W. (2d) (Tex. Civ. App.) 740; *Marmet Gas Co. v. Marmet,* 102 W. Va. 605, 135 S. E. 839; *Marathon County v. Industrial Comm.,* 225 Wis. 514, 272 N. W. 374, 275 N. W. 437; *State v. Board of School Land Com'rs,* 27 Wyo. 54, 191 Pac. 1073, 11 A. L. R. 539.

All of the cases to which I have called attention, and many others not cited, hold that to prevent "manifest injustice," or, where "justice and right require it," the state or any of its subdivisions may be estopped, even though they were acting in their governmental or sovereign capacity. This rule has been applied when invoked by individuals, by municipal corporations, by business establishments, by ordinary corporations, and by public service corporations. The rule of equitable estoppel, as mentioned before, is one of the greatest instrumentalities used to promote the ends of justice, and should be applied in all cases where it may be used to bring about a just and righteous result.

If there ever was a just cause for applying the doctrine of estoppel, this is one. The state's duly elected land commissioner, acting within the powers delegated to him by

statute, entered into a contract, by the terms of which an individual, and later, respondent corporation, agreed to secure certain minerals from the state, and pay a definite amount therefor. Then, when it was found necessary to determine the meaning of the words "treatment" and "transportation," the land commissioner and respondent corporation entered into an agreement concerning the method of carrying out the provisions of the contract. That agreement last mentioned caused respondent, Northwest, to spend an enormous amount of money—that is, the sum of $1,590,957.13, in stripping and mucking costs in order to carry out the agreement. This last agreement made by the land commissioner resulted in great advantage to the state in that it received over seventy thousand dollars from the operation of a quarry that was absolutely worthless in itself, and from an operation that could not have been carried on had the agreement not been made.

The authorities seem to be well agreed that there is implied in every delegation of power by statute to a state official, such additional powers as are reasonably necessary for the accomplishment of the assigned duty. Where the statute vests discretion in the official, it is clear that anything within the scope of his office is authorized. With few exceptions, *some* discretion is invested in every state office, and although the official must comply strictly with the provision of the statute regulating the exercise of his power, the basis for the determination of the implication of the statute must be gathered from the circumstances of each case. 43 Am. Jur. 69, Public Officers, § 250.

Throop on Public Officers 515, § 542, states that:

"The rule respecting such powers is, that in addition to the powers expressly given by statute to an officer or a board of officers, he or it has, by implication, such additional powers, as are necessary for the due and efficient exercise of the powers expressly granted, or as may be fairly implied from the statute granting the express powers."

In *State ex rel. R. Comm. v. Great Northern R. Co.*, 68 Wash. 257, 123 Pac. 8, this court held that there was incident

to the authority to order work done, the power to place a time limit in which it was to be accomplished. The facts were that the state railroad commission, after a proper hearing, ordered the construction of a railroad station house by the Northern R. Co., and prescribed a time at which it was to be completed. The Northern R. Co. failed to complete the station as specified and the railroad commission invoked the penalty clause. It was argued by the railroad company that, although under the railroad commission act, the commission had power to order performance of duties of the railroad declared in the act, no provision was made for the imposition of a time limit, and only a hearing and an order as to what duties should be performed could be considered as authorized by statute. In determining that the commission did have the power, the court stated:

"The admitted power of the commission to determine the duty and enforce performance under penalty carries with it the power and duty to determine manner of performance and time when the penalty for the failure to perform will attach. This is essential to the very genius of the law. The power to compel performance under penalty necessarily implies the power to fix a time beyond which failure to perform will not be tolerated, otherwise the provision imposing the penalty would be nugatory."

The act defines the powers of the commission and the duties of the railroads. In formulating specific instructions, the commission was merely performing requirements which were necessarily implied.

At another point, it was stated that:

"There is, therefore, conferred by necessary implication every power proper and necessary to the exercise of the powers and duties expressly given and imposed."

In the case of *In re Cashmere State Bank,* 169 Wash. 258, 13 P. (2d) 892, this court had occasion, in a well-considered opinion, to determine the extent of the authority of the supervisor of banking. In that case, it appeared that in 1932 the Cashmere State Bank of Cashmere, Washington, was declared unsound by the supervisor of banking and closed for the purpose of liquidation. Since the assets were

generally not marketable at that time at anything approximating their value, the supervisor sought to borrow from the Reconstruction Finance Corporation a sum sufficient to pay preferred claims, and declare and pay a dividend to general creditors and depositors. The closing of the bank was a major disaster, and no current payment and a final payment of a few cents on the dollar would have worked an incalculable hardship on the community. A depositor and stockholder appealed from an order of the superior court approving the transaction with the R.F.C., and presented the question of whether the state supervisor could borrow funds with bank assets as security for the purpose of satisfying preferred and general creditors. It was conceded that there was no express authority by statute or judicial decision for the loan. The statute, Rem. Comp. Stat., § 3269, provided that

". . . the examiner shall proceed to collect the assets thereof and to preserve, administer and liquidate the business and assets of such corporation."

Although other sections of the act made provision for the performance of certain acts which, arguably, were restrictive, the court, in agreeing with the lower court to approve the loan, said:

"Bearing in mind that the state supervisor of banking is an executive officer of the state, that his duties are of a public nature, and that, in the discharge of them, he acts in the public interest, we are induced to place such construction upon the statute as will enable him to administer speedily, adequately and comprehensively the trust imposed upon him."

Again it was stated that:

"The most that can be expected of this character of legislation is a declaration, in general terms, of the purpose for which the office is created and the officer appointed. Capacity co-extensive with the nature of the office and the object to be accomplished must be inferred, and the necessary power to function therein implied."

Since it was the duty of the supervisor of banking to collect, preserve, administer, and liquidate the assets of the bank, it was held as follows:

"Whatever, therefore, may be reasonably necessary in order to enable the state supervisor of banking to properly function and finally to effect as great and speedy a return as possible to those entitled thereto, may be said to be included within the preservation and administration of the bank's assets."

It was further stated that the state supervisor of banking was an executive officer of the state and as such ". . . acts in a governmental capacity for the public interest."

In *State ex rel. Taylor v. Superior Court*, 2 Wn. (2d) 575, 98 P. (2d) 985, this court held that county officers had the implied power to purchase necessary supplies for their offices.

In *Dalton v. Clarke*, 18 Wn. (2d) 322, 139 P. (2d) 291, it appeared that the Seattle transportation commission by authority of Rem. Rev. Stat. (Sup.), § 9488-6, contracted for improvements of facilities without calling for bids. Although there was a previous city charter provision requiring bids, it was held the statute left that question in the discretion of the commission, stating that:

"Certain duties may be prescribed and certain powers may be expressly granted, and, in order that these may be done and exercised in carrying out the letter and spirit of the law, other powers may have to be exercised in order that the law may be fully operative and the agency function, and, when necessary, certain powers will be implied."

These rules to which I have just called attention are applicable in the case at bar. The state land commissioner had a duty to perform after the contract had been let and transferred. He could do one of two things—refuse to make any arrangement relative to the conduct of the activities at the Moss quarry, with the result that the state would not be able to receive any royalties—or make an agreement such as was made. The state land commissioner acted, as he deemed it, best for the state. It was incumbent upon him to do those things reasonably necessary to carry into effect the provisions of the contract. He performed that

duty to the benefit of the state and an infant industry, and his actions should be upheld as binding upon the state.

Another compelling reason for affirming the judgment is that the trial court was in a better position than we to reach a proper conclusion. He saw the witnesses and heard them testify. Aside from that, he visited, and made a careful inspection of, the operations being conducted by respondent. That gave him another advantage denied to us.

The evidence given by the expert mining engineer, and those long engaged in the business, was uncontradicted, and should, in the absence of patent fraud or misrepresentation—and there was none urged, or present—be accepted without reservation. The acceptance of the uncontradicted evidence would lead to an affirmance of the judgment.

I agree with the majority that the dismissal of the Harbison-Walker Refractories Company and General Refractories Company should have been made without prejudice. Otherwise, I dissent.

MILLARD and ROBINSON, JJ., concur with SIMPSON, J.